**Perry JORDAN, Plaintiff,**

v.

**NORTH CAROLINA NATIONAL BANK, Defendant.**

**Civ. A. No. C–C–74–32.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 19, 1975.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McMILLAN, District Judge.

This action was tried on February 13, 1975 upon allegation of the plaintiff that the defendant had engaged in policies and practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, the plaintiff claimed that she had been denied employment opportunities as a result of the practices of the defendant which discriminated against her on account of her religious beliefs and practices. The plaintiff seeks injunctive relief, including equitable back pay, to remedy the claimed discrimination. Based on the evidence, the Court enters the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Plaintiff, Perry Jordan, is a black female citizen of the United States residing in Mecklenburg County, North Carolina.

2. Defendant, North Carolina National Bank, (hereinafter referred to as "NCÑB" or the "Bank"), is a North Carolina corporation doing business in, among other places, Mecklenburg County, North Carolina engaged in commercial banking.

3. The plaintiff is a Seventh Day Adventist. Her religious beliefs and practices absolutely prohibit her, with possible exceptions not pertinent to this case, from working during the Seventh Day Adventist Sabbath which runs from sundown Friday to sundown Saturday.

4. In August, 1968, the plaintiff began working for NCNB as a full-time draft clerk in the Proof-Transit Department in the Bank's Mecklenburg County main offices. At that time her religious persuasion was Baptist.

5. In September, 1968, the plaintiff became a Seventh Day Adventist. She has remained a Seventh Day Adventist since 1968 and has practiced the teachings and beliefs of the Seventh Day Adventist religion since that time.

Jonathan P. Wallas, Chambers, Stein & Ferguson, Charlotte, N. C., for plaintiff.

J. W. Alexander, Jr., and John O. Pollard, Blakeney, Alexander & Machen, Charlotte, N. C., for defendant.

6. After becoming a Seventh Day Adventist in September, 1968, the plaintiff advised her supervisor of the change in her religious persuasion and as a result sought to transfer to a job with the Bank which would not require her to work on Saturday, her Sabbath. Pursuant to her request for a job which did not require Saturday work, she was given a part-time job as a Balance and Control Clerk in the Bank's Proof-Transit Department effective September 16, 1968. On September 11, 1968, the plaintiff signed an employment contract with the Bank agreeing to accept the part-time employment and further agreeing to work on Monday, Tuesday, Wednesday, Thursday and Friday of each week, but not on Saturday. As a result of her transfer from full-time to part-time work plaintiff became ineligible for certain fringe benefits including certain life insurance, health insurance and other benefits provided by NCNB for full-time employees. The arrangements with respect to the transfer from full-time to part-time work were made by the plaintiff with Mrs. McConnell, a bank supervisor.

7. At the time plaintiff transferred from full-time to part-time work she was promised by Mrs. McConnell that she would be given full-time work when a full-time job opened which did not require Saturday work.

8. The plaintiff worked as a part-time Balance and Control Clerk from mid-September, 1968, until April, 1969. Her job grade in this position was Level Three which was the same grade as her former full-time job. During the period she worked part-time the plaintiff was not offered a full-time job.

In April, 1969, the plaintiff voluntarily terminated her job with the Bank to join her husband who was overseas on military duty. At the time the plaintiff terminated her employment she was evaluated by personnel at the Bank.

She was rated as an average employee who was eligible for rehire. The plaintiff at the time of her Exit Interview in April, 1969, indicated that she wanted to return to work with the Bank in 1970 when she anticipated she and her husband would be returning to Charlotte from overseas. In the pertinent part of the Termination Notice and Record completed by Bank employees when the plaintiff terminated her job in April, 1969, the question on the form "Would you recommend for rehire" was answered by NCNB officials, "Yes; however, Perry's religion limits her from Saturday work". In her Exit Interview it was commented (apparently by the plaintiff) that Mrs. Jordan "[h]as not worked with any Company that she had liked as well as NCNB".

9. In April, 1970 the plaintiff and her husband returned from overseas and reestablished their home in Charlotte, North Carolina. In early May, 1970, the plaintiff went to the offices of NCNB to seek reemployment. At that time, she obtained an interview with Harris A. Rainey, Jr., an employee of NCNB who, at that time, was Employment Manager and who was responsible for hiring clerical employees. The plaintiff met with Mr. Rainey in his office. At that time, Rainey had copies of the plaintiff's previous employment records which had been maintained by the Bank covering her period of employment from August, 1968, to April, 1969. Mr. Rainey knew that the plaintiff was a Seventh Day Adventist. He did not question the sincerity of her religious beliefs,[1] and he knew, both from Bank records and from the conversation he had with the plaintiff, that the plaintiff's religion absolutely prohibited her from working from sundown Friday to sundown Saturday.

10. At the initial interview for reemployment in May, 1970, the plaintiff indicated her desire to return to work with the Bank. She indicated the will-

---

1. The sincerity of the plaintiff's religious beliefs has not been an issue in this case. The defendant has assumed at all times pertinent and the Court finds as a fact that the plaintiff has been a sincere and practicing Seventh Day Adventist since September, 1968.

ingness to accept either a full-time job or a part-time job.[2] At that time, since neither she nor her husband had any employment, the plaintiff was anxious to obtain any type of work. She was further interested in obtaining reemployment with NCNB since her previous employment with the Bank had proven mutually satisfactory.

Plaintiff, during her initial interview with Mr. Rainey in May, 1970, indicated that she desired any type of work which would not require her to work on Saturday. She indicated that she would be willing to work on Sunday if necessary and that she would further be willing to work overtime at anytime which did not conflict with her Sabbath. She explained to Rainey, however, that her religion absolutely prohibited her from Saturday work at NCNB.

11. Rainey explained to the plaintiff that the Bank could not promise her that she would never have to work on Saturday. Rainey made no efforts to determine if there were jobs within the Bank wherein the plaintiff's religious beliefs could be accommodated. He merely spoke to Mr. Charles Cooley, his superior at the Bank, who reaffirmed Rainey's conclusion that the Bank could not promise (or guarantee) the plaintiff that she would never have to come in on Saturday. Rainey indicated that any job in the Bank might require Saturday work and that the plaintiff would have to be available for Saturday work if, when an emergency occurred, she was called. The plaintiff in her discussions with Rainey, emphasized that her religion absolutely prohibited her from working on her Sabbath and that she could not take a job where her employer would expect her to work on her Sabbath and where she would be required to work and to be available to work on her Sabbath. Rainey understood the plain-

tiff's beliefs but made no attempts to locate a job for the plaintiff where Saturday work would not be necessary.

12. At trial, Rainey admitted he was not knowledgeable with respect to all the various job functions and duties in all departments at the Bank. He admitted that the front line or department supervisors were much more familiar with the various job requirements in their department and were better qualified to determine whether there were jobs available in their departments for which the plaintiff was qualified and in which she would not have to work on Saturday. No investigation was conducted and no department heads were contacted to ascertain if the plaintiff's religious beliefs could be accommodated. Neither in May, 1970, or thereafter did Rainey speak to any department supervisors or foremen to attempt to find a job where Saturday work could be absolutely excluded. The Court finds that no attempts were made by Rainey or any other Bank officials to attempt to determine if there was a job in the Bank to accommodate the plaintiff's religious practices and beliefs.

13. As of May, 1970, the Bank's entire Equal Employment Opportunity policy was the following brief statement:

## POLICY OF DISCRIMINATION

It has been and will continue to be the Policy of North Carolina National Bank to recruit and hire qualified applicants without regard to race, creed, color, sex, age or national origin; and to treat employees equally with respect to compensation and opportunities for advancement, including upgrading, training, promotion, and transfer.

Bank officials had never formulated or communicated to its personnel supervisory staff any policies with respect to

2. The testimony is in conflict with respect to whether or not the plaintiff was willing to accept a part-time job in May, 1970. Based on the evaluation of all the testimony and the fact that the plaintiff had previously found part-time work with the Bank highly satisfactory, the Court finds as a fact that the plaintiff sought and was willing to accept either part-time or full-time employment.

accommodation of the religious beliefs and practices of Bank employees or prospective NCNB employees. There were no written standards with respect to the proper procedures to take to attempt to accommodate religious beliefs, and Mr. Rainey, the Personnel Manager, was not aware of the regulations concerning religious discrimination promulgated prior to 1970 by the Equal Employment Opportunity Commission ("EEOC").

14. As of May 15, 1970, the Bank employed approximately 1243 employees. As of June 15, 1970, the Bank employed approximately 1261 employees. As of May, 1970, and thereafter there were vacancies at the Bank in jobs for which the plaintiff was qualified. The plaintiff had previously been employed in a Level Three grade job which is a clerical job. The Bank maintains numerous Level Three positions and there are positions at Level Three in most of NCNB's departments.

15. Following her initial interview with Mr. Rainey, the plaintiff returned on several occasions to the Bank to seek reemployment. She also telephoned a number of times to speak to Mr. Rainey or to Ms. Nada Bradshaw, a personnel interviewer, requesting further information on job opportunities at the Bank. The plaintiff was sent to one or more job interviews but the jobs for which she was considered were jobs which regularly or often required Saturday work. The plaintiff was informed of the Saturday work required in these jobs and she, because of her religious beliefs and practices, could not, in good faith, accept those jobs.

16. The great majority of the Bank's operations are not normally in operation on Saturday. For most employees, Saturday is not a normal work day.

17. The Bank, in its various dealings with the plaintiff in May and June, 1970, took no steps to attempt to accommodate the plaintiff's religious. beliefs and practices. Specifically, the Bank refused to take any steps to investigate, through interoffice channels, whether or not there were jobs available in various departments in the Bank where the plaintiff would not have to be available for Saturday work and where the plaintiff's religious beliefs could be accommodated. The Bank, by refusing to accommodate the needs of the plaintiff and by refusing to attempt to find a job for her which would not require Saturday work, made clear its policies required that all employees be available to work on Saturday if called.

18. When the plaintiff was unable in May and June, 1970, to obtain a job with NCNB with accommodations to her religion, she, on June 26, 1970, filed a charge of discrimination with the EEOC alleging that she had been denied employment because of her religious creed and her race.[3]

19. On October 29, 1973, the EEOC mailed, by certified mail, a "Notice of Right to Sue Within 90 Days" letter to the plaintiff. On November 6, 1973, the letter was delivered to 9830 Feldbank Drive where the plaintiff's husband, Samuel Jordan, signed the certified mail receipt in the plaintiff's name. As of November 6, 1973, the plaintiff and her husband had separated and were not living together. The plaintiff was living with her mother at an address different than 9830 Feldbank Drive on November 6, 1973. On November 10, 1973, the plaintiff returned to the home where her husband was then residing and opened the letter from the EEOC containing the Right to Sue letter. The plaintiff received her first actual notice of the Right to Sue letter on November 10, 1973. The Complaint in this action was filed on February 6, 1974, within the 90 days required by statute.

20. Elizabeth Woods, a Seventh Day Adventist, testified at the trial. Ms. Woods testified that she began working for NCNB on January 8, 1974. Prior to the time she began working for the

---

3. There are no claims of racial discrimination raised in this action.

Bank, she was interviewed for a job with the defendant by Tom Nicholson, a NCNB employee. After her initial interview with Mr. Nicholson she spoke with the supervisor in the audit department, Ken McReady. When Ms. Woods spoke to McReady, she informed him that she was a Seventh Day Adventist and that, as such, she could not work from sundown Friday until sundown Saturday. She did agree to work overtime on Sunday or during periods other than her Sabbath. McReady informed Ms. Woods that she would not have to work on Saturday and if extra work was necessary over the weekend she could do the work on Sunday. Ms. Woods' position is that she absolutely cannot work on Saturday; the defendant has successfully accommodated her religious needs without a hardship on the Bank. McReady has guaranteed (or promised) Ms. Woods that she will never be asked to work on Saturday and never will have to work on Saturday. Other employees in the audit department do work on Saturday from time to time. In addition, training programs are held on Saturday. Ms. Woods is not required to work on Saturday or to attend any Saturday training programs. She has observed no morale problems in her department because of the accommodations made to her beliefs and, to the best of her knowledge, there have been no complaints concerning the fact that NCNB has accommodated her religious beliefs.

21. The defendant's position that accommodation of plaintiff's religious beliefs would result in business hardships to NCNB with respect to employee relations, morale, personnel management, discipline and uniformity of policy is not demonstrated by the evidence. Indeed, the religious needs of Elizabeth Woods, a Seventh Day Adventist who has worked and is now working for the Bank, have been met with no hardship to the defendant. There is simply no evidence that morale will suffer or that disciplinary problems would be created if the plaintiff's religious needs had been or are now accommodated. In fact, all the evidence is to the contrary.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this action pursuant to § 706(f) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f). The defendant NCNB is an employer engaged in an industry affecting commerce within the meaning of § 701(b) of Title VII, 42 U.S.C. § 2000e(b).

2. The plaintiff having filed the Complaint herein within 90 days of actual receipt of the pertinent Right-to-Sue letter has complied with the jurisdictional prerequisites of § 706 of Title VII for instituting this action, 42 U.S.C. § 2000e–5, and this action is timely brought in this Court. *Franks v. Bowman Transportation Company*, 495 F.2d 398 (5th Cir. 1974); *Plunkett v. Roadway Express, Inc.*, 504 F.2d 417 (10th Cir. 1974).

3. The history with respect to the religious discrimination portions of Title VII is set forth in detail in the cases of *Riley v. Bendix Corporation*, 464 F.2d 1113 (5th Cir. 1972) and *Reid v. Memphis Publishing Co.*, 468 F.2d 346 (6th Cir. 1972). In capsulized form, the history is as follows:

(A) In 1964, Title VII was passed, effective July 2, 1965. Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1) states that:

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin.

(B) On July 10, 1967, EEOC Regulation 1605.1(b) (29 C.F.R.1605) was adopted. That regulation, designed to provide guidelines with respect to religious discrimination and Title VII, provides:

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of

1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

(C) On June 6, 1970, the case of *Dewey v. Reynolds Metals Co.*, 429 F. 2d 324 (6th Cir. 1970) was decided. In *Dewey*, the Sixth Circuit refused to apply the 1967 EEOC Regulation 1605.1 and reversed a lower court ruling which had given the plaintiff relief. The *Dewey* case was subsequently affirmed without opinion by the United States Supreme Court by an equally divided Court.

(D) In the spring of 1971, the case of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) was decided establishing (a) that in passing Title VII Congress required the removal of all employment barriers, (b) that the employment practice "touchstone" was "business necessity", and (c) that administrative (i. e., EEOC) interpretations of Title VII are entitled to "great deference".

(E) Effective March 24, 1972, numerous amendments to and changes in Title VII were made including the addition of Section 701(j), 42 U.S.C. § 2000e(j) which defines the term "religion" as follows:

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(F) Subsequent to March, 1972, the *Riley* and *Reid* cases were decided.

■ The Courts in *Riley* and *Reid*, after reviewing the entire history capsulized above, found that EEOC Regulation 1605.1(b) had properly mirrored the will of Congress all along. Thus, while 42 U.S.C. § 2000e(j) did not exist in May or June, 1970, (the relevant time period in this action) the pertinent 1967 EEOC regulation [1605.1(b)] reflected the original intent of Congress with respect to the 1964 Act. As Judge Tuttle said in *Riley, supra* at 1117:

We are satisfied that the guidelines in effect at the time of Riley's discharge were valid, as being a proper interpretation of the statute, and as validated by the consequent legislative recognition of that fact . . . .

Thus, that part of Title VII passed in 1964 as interpreted by EEOC Regulation 1605.1(b) was in full force in May and June, 1970 when the plaintiff sought employment with NCNB, and the obligations of the parties must be measured by the standards set forth in the 1967 EEOC Regulation 1605.1(b) which were later adopted by Congress in 42 U.S.C. § 2000e(j).

■ In this action, the plaintiff has met her burden of proof by the preponderance of the evidence regarding her allegations that she was discriminated against by the defendant because of her religious beliefs and practices in violation of Title VII by showing (1) that she is a sincere Seventh Day Adventist whose religious beliefs and practices will not allow her to work for the defendant during her Sabbath; (2) that she applied for and was qualified for available job positions with the defendant in May and June, 1970; (3) that she informed the defendant of her sincere religious beliefs and requested that accommodations be made wherein her beliefs and practices would not be compromised; (4) that the defendant refused to take reasonable steps to accommodate the religious beliefs of the plaintiff and specifically refused to attempt to find a

job wherein her religious beliefs could be accommodated, and; (5) that the defendant has failed to demonstrate that an accommodation to the religious beliefs of the plaintiff would work an undue hardship on the defendant's business. Compare, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973).

Both 42 U.S.C. § 2000e(j) and EEOC Regulation 1605.1(b) require employers to accommodate both employees *and prospective employees.* The phrase "prospective employees" should not be treated as surplusage but should be interpreted so as to effectuate the remedial intent[4] of Congress to expand religious freedom by requiring that employers must attempt to accommodate the religious beliefs and practices of applicants for employment *prior* to their employment to insure that an applicant can accept a job with a clear conscience knowing that his particular religious needs have been accommodated. NCNB has not made such an attempt in this case.

■ Once the plaintiff met her initial burden of establishing a *prima facie* case, the burden shifted to the employer.

. . . the *employer* must prove either that he in fact made a reasonable accommodation, or that he was unable reasonably to accommodate to an employee's religious observances. Generally, the issue in cases of this nature is whether the rearranging of the work schedule would cause undue hardship (emphasis in the original) *Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937, 941 (M.D.Ala.1974).

See also, *Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir. 1971) and Judge Sobeloff's discussion of "business necessity" at pp. 798–800. NCNB has wholly failed to meet its burden in this case and the plaintiff is therefore entitled to appropriate relief.

■ 5. Contrary to the contentions of the defendant, neither 42 U.S.C. § 2000e(j) nor EEOC Regulation 1605.-1(b) violate the First Amendment.

The First Amendment reads, in pertinent part, as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .

While the tension between the Establishment Clause and the Free Exercise Clause has been termed a "head-on collision", *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Justice Stewart concurring at 374 U.S. 414, 83 S.Ct. 1799), the *Sherbert* case indicates that the accommodations required by the pertinent statute and regulation do not "establish" any religion but rather promote, in a manner consistent with our national history, the free exercise of religion. See also, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

In *Sherbert,* the plaintiff was discharged because she would not work on Saturday, her Sabbath. (The *Sherbert* case was decided before Title VII became law.) When she was unable to obtain other employment, she filed for benefits under the South Carolina Unemployment Compensation Act. Subsequently, she was denied benefits because she refused "suitable work". The United States Supreme Court reversed the decision of the South Carolina State Supreme Court holding that the State's requirement, in effect, that the plaintiff be available for work on her Sabbath burdened her religious beliefs in violation of the Free Exercise Clause. Justice Brennan further stated:

In holding as we do . . . we are not fostering the "establishment" of the Seventh Day Adventist religion . . . for the extension of unemployment benefits to Sabbatarians in common with Sunday worshippers re-

---

4. While it is often difficult to discern legislative intent, it seems clear that Section 701(j) of Title VII was passed in order to legislatively overrule the *Dewey* case. See, Legislative History of the Equal Employment Opportunity Act of 1972, pp. 711–733.

flects nothing more than the government obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions . . . (prohibited by the Establishment Clause) *Sherbert, supra,* 374 U.S. at 409, 83 S.Ct. at 1797.

In the *Yoder* case, members of the Amish faith refused, on religious grounds, to send their children aged 14 or 15 to public school after the children had completed the eighth grade. The criminal convictions of the Amish were upheld by the Wisconsin Supreme Court. The Supreme Court, per Chief Justice Burger, reversed, holding that the sincere and historical beliefs of the Amish had to be accommodated by the State where, on balance, the constitutional requirement of religious freedom outweighed the interest asserted by the State of Wisconsin. Similarly, § 2000e(j) and EEOC Regulation 1605.-1(b) do not require accommodation for any and all religious beliefs but adopt a test of reasonableness and allow employers to demonstrate if undue hardship will occur.

Thus, the accommodation sought by the plaintiff is similar to that given in *Sherbert* and *Yoder* and is not an establishment of religion. Indeed, the Court in *Committee For Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) emphasizes that the primary evils which the Establishment Clause protects are "sponsorship, financial support, and active involvement of the sovereign in religious activities". *Nyquist, supra,* 413 U.S. at 772, 93 S.Ct. at 2965 quoting *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). There is simply a constitutional difference in those cases where the government provides money either directly or indirectly to religious institutions (usually religious educational institutions) and situations where the government requires that religious beliefs be treated with neutrality as in *Sherbert* or be accommodated as in *Yod-*

er. As Justice Stewart wrote in *Sherbert* at 374 U.S. 415–416, 83 S.Ct. 1800:

> . . . the guarantee of religious liberty embodied in the Free Exercise Clause affirmatively requires government to create an atmosphere of hospitality and accommodation to individual belief or disbelief . . . .

§ 2000e(j) and its predecessor EEOC Regulation 1605.1(b) are, by their very terms, designed to encourage and protect individual religious freedom. No religion receives monetary benefits; no religion is singled out for special treatment. The statute requires accommodation to religious freedom in a practical framework.

As Justice Douglas wrote in *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952):

> We are a religious people . . . We sponsor an attitude on the part of the government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma . . . [a State acts properly when it] respects the religious nature of our people and accommodates the public service to their spiritual needs . . . . 343 U.S. at 313–314, 72 S.Ct. at 684.

Congress, as evidenced by the debates relating to the 1972 Amendments to Title VII felt § 2000e(j) furthered First Amendment freedoms. Senator Harrison Williams in discussing § 2000e(j) quoted the pertinent portion of the First Amendment and stated "In dealing with the free exercise thereof, really, this [i. e. § 2000e(j)] promotes the constitutional demand in that regard". "Legislative History of the Equal Employment Opportunity Act of 1972", p. 715.

■ 6. The plaintiff has suffered economic loss as a result of the refusal of the defendant to accommodate her religious beliefs. Therefore, plaintiff is entitled to back pay from the defendant,

and there are no special circumstances in this case that would render unjust an award of back pay. See *Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 253–254 (5th Cir. 1974).

■ 7. Plaintiff, as the prevailing party herein, is entitled to recover her costs including reasonable attorney's fees, court costs, and expenses. *Lea v. Cone Mills Corp.*, 438 F.2d 86 (4th Cir. 1971); *Robinson v. Lorillard Corp., supra.*

## ORDER

Based on the Findings of Facts and Conclusions of Law previously filed in this action, it is hereby ordered, adjudged and decreed:

1. That the defendant, North Carolina National Bank, is hereby enjoined from discriminating against the plaintiff, Perry Jordan, because of the religious beliefs and practices of the plaintiff.

2. That the defendant, North Carolina National Bank, offer to the plaintiff, in writing, the next vacancy for which the plaintiff is qualified which occurs at the Bank's offices in Charlotte, North Carolina in which the plaintiff's religious beliefs and practices can be accommodated.

3. That the plaintiff be and hereby is awarded back pay against the defendant for the period since May 15, 1970.

4. That the back pay award is to be a sum which is the difference, computed on a quarterly basis from May 15, 1970 to the date of the entry of this Order, between what the plaintiff would have earned in a Level Three job with the defendant during said time period and what she actually earned or could have earned during said period with reasonable diligence.

5. That interest in the amount of 6% per annum be and is hereby allowed on the accrued back pay.

6. That the plaintiff be and is hereby awarded her costs in this action including reasonable counsel fees, court costs and expenses.

7. Counsel for the parties are directed to meet and confer within thirty (30) days of the entry of this Order for the purpose of fixing or agreeing upon the amount to be awarded as back pay pursuant to the formula set out herein. Absent an agreement by the parties, the parties are ordered to exchange pertinent documents and records relevant to the fixing of a dollar amount back pay award and to submit their respective positions concerning computation of back pay to the Court within forty-five (45) days of the entry of this Order. The Court will thereafter enter an Order fixing the dollar amount of the back pay award.

8. Counsel for the parties are also directed to meet and confer within thirty (30) days of the entry of this Order for the purpose of agreeing upon costs, attorney's fees and expenses. Absent such an agreement, (1) counsel for the plaintiff is directed to file with the Court a statement of time for which attorney's fees are claimed and an itemization of costs and expenses and (2) the defendant is directed to file a statement with the Court setting forth the basis on which they have compensated their counsel and the dollar amount they have paid or expect to pay their counsel in this action. If counsel are unable to agree on costs, attorney's fees and expenses the respective statements required herein shall be filed within forty-five (45) days of the entry of this Order.