DEPARTMENT OF CIVIL RIGHTS *ex rel* PARKS v GENERAL
MOTORS CORPORATION

Docket No. 64141. Argued November 14, 1980 (Calendar No. 7).—
Decided March 1, 1982.

Mary Parks brought a complaint before the Civil Rights Commis-
sion against General Motors Corporation under the State Fair
Employment Practices Act, charging that the defendant had
dismissed her from its employment because her religious be-
liefs, as a Seventh-day Adventist, conflicted with her assigned
hours of work. The plaintiff's religion forbids work on the
Sabbath, between sunset on Friday and sunset on Saturday.
She was assigned to work the second shift at the defendant's
Pontiac Fisher Body plant, from 4 p.m. until 12:30 a.m., and
after telling her foreman on the day before each Friday that
she could not work the following day because of her religious
beliefs, she failed to report to work on three consecutive Fri-
days. The defendant admits that it terminated her employment
without considering other action to accommodate her religious
practice. The Civil Rights Commission found the defendant
guilty of unlawful religious discrimination and ordered it to
reinstate her with back pay and other benefits. The Oakland
Circuit Court, Francis X. O'Brien, J., reversed the order on the

REFERENCES FOR POINTS IN HEADNOTES

[1-4, 9-11, 14, 15, 19, 20] 15 Am Jur 2d, Civil Rights §§ 195, 196.
Fair employment statutes designed to eliminate racial, religious, or
national origin discrimination in private employment. 44 ALR2d
1138.
[2] 1 Am Jur 2d, Administrative Law § 127.
2 Am Jur 2d, Administrative Law § 301.
16A Am Jur 2d, Constitutional Law § 490.
[3] 73 Am Jur 2d, Statutes § 145.
[5] 15 Am Jur 2d, Civil Rights § 318.
[6] 15 Am Jur 2d, Civil Rights § 194.
[7, 21] 15 Am Jur 2d, Civil Rights § 199.
[8] 15 Am Jur 2d, Civil Rights § 193.
[12, 13, 16] 2 Am Jur 2d, Administrative Law §§ 233, 234, 236.
[17-19] 16A Am Jur 2d, Constitutional Law § 466 *et seq.*
Supreme Court cases involving establishment and freedom of reli-
gion clauses of Federal Constitution. 37 L Ed 2d 1147.

ground that requiring the defendant to make the accommodation exceeded the authority of the Civil Rights Commission under the State Fair Employment Practices Act. The Court of Appeals, Beasley, P.J., and Allen and D. C. Riley, JJ., affirmed (Docket No. 78-1885). The Department of Civil Rights appeals.

In opinions by Justices Kavanagh, Levin, and Williams, the Supreme Court *held:*

The State Fair Employment Practices Act does not impose a duty on the employer to make reasonable accommodations to an employee's religious needs. However, there may be a finding of discrimination based on evidence that an employer failed to act affirmatively to avoid the discriminatory effect of a facially neutral practice, and the cause is remanded to the circuit court for further proceedings.

Justice Kavanagh, joined by Chief Justice Coleman and Justice Ryan, would affirm the decision of the Court of Appeals for the reasons set forth in that Court's opinion. They are:

1. The interpretive guidelines promulgated by the Civil Rights Commission, which construed the statute as imposing a duty on the employer to make reasonable accommodations to the religious needs of employees where the accommodations can be made without undue hardship on the conduct of the employer's business, were not binding on employers. An interpretive guideline of this kind is, under the Administrative Procedures Act, an agency statement of policy which does not have the force of law, and which binds the agency but not any other person. The guidelines were issued without either the authority or procedure necessary to have them given effect as a rule.

2. The statute, which by its terms prohibits religious discrimination, does not include a duty reasonably to accommodate the religious needs of employees. The Legislature did not enact legislation expanding the prohibition to include the duty, as did the Congress after the substantially identical federal statute was held not to include the duty. In the absence of any clear legislative interpretation that the term "discrimination" includes a duty to make reasonable accommodations, such a construction goes beyond the legislative mandate. Not only did the Legislature fail to enact positive legislation, but on three occasions when it amended the act for other purposes, it failed to deal with religious accommodation. Furthermore, the courts are reluctant to find affirmative duties in a general ban on discrimination. The doctrine of legislative acquiescence in administrative interpretation does not apply in this case because

none of the factors relied on by the courts in applying the doctrine are present.

Justice Levin agreed with Justice Kavanagh that the State Fair Employment Practices Act does not impose a separate obligation to accommodate the religious needs of employees. An employer may nevertheless be required to act affirmatively to avoid discriminating against an employee because of religion.

1. It is the duty of the Civil Rights Commission, under the Constitution of 1963, to investigate allegations of discrimination because of religion in the enjoyment of civil rights guaranteed by law and the constitution, and to secure the equal protection of those rights without religious discrimination. The right to an opportunity to be employed is a civil right guaranteed by law. Justice Levin agreed with Justices Williams and Moody that "discrimination" includes practices that are fair in form, but discriminatory in operation. An employer may be obliged to act affirmatively to avoid a discriminatory effect.

2. The stipulation of facts does not say whether General Motors, in particular cases or as a matter of policy or practice, made changes in the work schedule so that employees can refrain from work on their days of religious observance. Nor does it appear whether the refusal to accommodate Mary Parks' religious needs was inconsistent with past conduct, policy or practice of General Motors, or otherwise might have discriminated against her because of religion. The concession that General Motors refused to consider an alternative to discharge does not, standing alone, establish a policy or practice "discriminatory in operation" or that GM discriminated against her because of religion.

3. Whether a particular policy or rule of federal law should be incorporated into Michigan law should be decided as the issue arises. The guideline adopted by the United States Equal Employment Opportunity Commission which requires an employer to make reasonable accommodation to the religious needs of employees may reflect a perception that employers of large numbers of persons generally make an effort to do that where it can be done without undue hardship on the conduct of the employer's business, and may further reflect the view that it is therefore appropriate to presume discrimination because of religion from a failure so to accommodate with the burden of justifying the failure on the employer. However, it has not been shown that such a generalization has a factual basis in the experience of the administrative agencies to support it as the proper construction of the statute.

4. In this case, the Department of Civil Rights and General

Motors apparently desire an answer to the abstract question whether the State Fair Employment Practices Act should be read as imposing a duty of reasonable accommodation. Justice Levin agreed, for the reasons set forth by the Court of Appeals, there is no present reason for reading the State Fair Employment Practices Act, enacted in 1955, as imposing the duty of an employer under federal law to make reasonable accommodation to the religious needs of an employee.

5. The opinion of the Court does not preclude a finding of discrimination based on evidence that an employer failed to act affirmatively to avoid the discriminatory effect of a facially neutral practice, and leaves open the questions whether failure of an employer to accommodate the religious needs of employees or prospective employees may constitute discrimination, what would be a fair allocation of the burden of proof, and what should constitute valid defenses.

The cause should be remanded to the circuit court for further proceedings.

Justice Williams, joined by Justices Fitzgerald and Moody, would hold that the statutory duty to refrain from religious discrimination in employment imposes a duty on the employer to make reasonable accommodation of an employee's religious needs unless an undue hardship would be occasioned thereby. This duty does not violate either the state or federal constitutions. However, they agreed with Justice Levin that there is nothing in this matter to preclude a finding of discrimination based on evidence that the employer failed to avoid the discriminatory effect of a facially neutral practice. Therefore, they would remand to the circuit court on that issue.

1. The language of the State Fair Employment Practices Act does not show clearly whether the Legislature intended to impose upon an employer an obligation of reasonable accommodation of an employee's religious practices, as part of the duty to refrain from religious discrimination in employment. The administrative guideline or interpretation by the Civil Rights Commission which requires reasonable accommodation is not controlling, and under the Administrative Procedures Act does not have the force or effect of law, but is merely explanatory. The task, then, is to construe the legislative will as found in the statute.

2. Case law from other jurisdictions, while not controlling, can guide the Court where it is appropriate and sound. A common thread in such cases is that discriminatory consequences of otherwise neutral employment practices should be eliminated unless an undue hardship would be placed on the

employer's business. In addition, the guideline promulgated by the Civil Rights Commission is due some particular deference because of the constitutional establishment of the commission. A requirement of reasonable accommodation is a valid and reasonable construction of a general prohibition of religious discrimination and is in accord with the purpose of the State Fair Employment Practices Act to prevent and eliminate religious discrimination. The burden of proving that a reasonable accommodation cannot be made without undue hardship is on the employer.

3. The prohibition against religious discrimination in employment embraces the concept of religious practice as well as that of religious belief, and the Legislature necessarily included both concepts in the statute. It follows that a duty to make reasonable efforts to accommodate religious practices arose with the enactment of the law in order to achieve fully the prohibition of religious discrimination in employment. The failure of the Legislature to amend the State Fair Employment Practices Act to incorporate the substance of the administrative guideline of the Civil Rights Commission does not raise the inference that the Legislature intended to disapprove it.

4. The traditional view is that to be constitutional under the Establishment Clause of the First Amendment, a law concerning religion must reflect a clearly secular legislative purpose, must have a primary effect that neither advances nor inhibits religion, and must avoid excessive government entanglement with religion. That three-part test, however, only serves as a guideline to identify impairment of the objectives of the Establishment Clause and does not set the precise limits to the necessary constitutional inquiry. The Supreme Court of the United States has said that it will not tolerate either governmentally established religion or governmental interference with religion. Total separation between church and state is not called for, nor is it possible; some relationship between government and religious organizations is inevitable. Incidental, indirect or remote benefits to religion do not alone render a particular law constitutionally invalid. The problem, like many others in constitutional law, is one of degree.

5. The requirement of reasonable accommodation in this case is entirely consistent with the constitutionally necessary governmental neutrality in matters of religion. The primary and direct effect is to provide individual persons with a greater opportunity to secure or retain employment. Any aid filtering to a particular religious institution or to religion in general from the imposition of the requirement is too indirect and

remote to be constitutionally significant. The requirement is not tainted by the evils of sponsorship, financial support, and active involvement of the government against which the Establishment Clause was intended to afford protection.

6. Each case involving reasonable accommodation necessarily depends on its own facts and circumstances; the trier of fact is in the best position to weigh the considerations of the individual employment relation. An employer, in response to a communication of the religious needs of an employee, must at least make some good-faith effort at accommodation or show that it was unable reasonably to make the accommodation without undue hardship to its business. In this case, the claimant has made a prima facie showing of religious discrimination and the need for accommodation between her observance of the Sabbath and the defendant's work schedule. General Motors has taken the position that it has no duty of reasonable accommodation. The Court agrees with General Motors on that issue but there is nothing to preclude a finding of discrimination based on evidence that General Motors failed to act affirmatively to avoid a discriminatory effect of a facially neutral practice.

OPINION BY KAVANAGH, J.

1. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — DUTY OF EMPLOYER.

The State Fair Employment Practices Act does not impose a duty on an employer to make reasonable accommodation to the religious needs of employees (MCL 423.301 *et seq.;* MSA 17.458[1] *et seq.).*

2. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — ADMINISTRATIVE LAW.

*The Civil Rights Commission cannot legislate or impose substantive duties or penalties beyond the scope of its authority under the State Fair Employment Practices Act to proscribe religious discrimination in employment (MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

3. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — STATUTES — CONSTRUCTION.

*To construe the State Fair Employment Practices Act to require an employer to make reasonable accommodation to the religious practices of an employee goes beyond the legislative mandate (MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

Opinion by Levin, J.

4. Civil Rights — Religious Discrimination — Fair Employment Practices Act.

The State Fair Employment Practices Act does not impose a separate obligation upon an employer to meet the religious needs of employees (MCL 423.301 *et seq.;* MSA 17.458[1] *et seq.).*

5. Civil Rights — Religious Discrimination — Fair Employment Practices Act — Civil Rights Commission.

*It is the duty of the Civil Rights Commission, under the Constitution of 1963, to investigate allegations of discrimination because of religion in the enjoyment of the right to an opportunity to be employed, which is a civil right guaranteed by the State Fair Employment Practices Act, and to secure the equal protection of that right without religious discrimination (Const 1963, art 1, § 2; art 5, § 29; MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

6. Civil Rights — Religious Discrimination — Fair Employment Practices Act — Words and Phrases.

*The term religious discrimination, under the State Fair Employment Practices Act, includes practices that are fair in form, but discriminatory in operation; an employer may be obliged to act affirmatively to avoid a discriminatory effect (Const 1963, art 5, § 29; MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

7. Civil Rights — Sundays and Holidays — Fair Employment Practices Act.

*A stipulation by an employer that it refused to consider an alternative other than discharge from employment of an employee because her observance of the Sabbath as a Seventh-day Adventist conflicted with her assigned hours of work does not, standing alone, establish a policy or practice discriminatory in operation or that the employer discriminated against the employee because of religion (MCL 423.303; MSA 17.458[3]).*

8. Civil Rights — Fair Employment Practices Act — Administrative Law — Constitutional Law.

*Neither the State Fair Employment Practices Act nor the Constitution of 1963 requires the assimilation into Michigan law of whatever Congress enacts, federal agencies promulgate or federal courts decide on the issue of discrimination in employment; whether a particular policy or rule of federal law should be incorporated into Michigan law should be decided as the issue arises (Const 1963, art 5, § 29; MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

9. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
   PRACTICES ACT.

   *There is no present reason for reading the State Fair Employ-
   ment Practices Act as imposing a duty upon an employer to
   make reasonable accommodation to the religious needs of an
   employee where that can be done without undue hardship to
   the conduct of the employer's business (Const 1963, art 5, § 29;
   MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

10. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
    PRACTICES ACT — ADMINISTRATIVE LAW.

    A decision that the State Fair Employment Practices Act does
    not impose a duty on an employer to make reasonable accom-
    modation to the religious needs of an employee as a matter of
    law does not preclude a finding of religious discrimination, as a
    matter of fact, based on evidence that an employer failed to act
    affirmatively to avoid the discriminatory effect of a facially
    neutral practice (Const 1963, art 5, § 29; MCL 423.303; MSA
    17.458[3]).

    OPINION BY WILLIAMS, J.

    See headnote 10.

11. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
    PRACTICES ACT — DUTY OF EMPLOYER — REASONABLE ACCOMMO-
    DATION.

    *The statutory duty under the State Fair Employment Practices
    Act to refrain from religious discrimination in employment
    imposes a duty on an employer to make reasonable accommo-
    dation to the religious needs of an employee where that can be
    done without undue hardship to the conduct of the employer's
    business (MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

12. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
    PRACTICES ACT — ADMINISTRATIVE LAW.

    *An administrative guideline or interpretation of the State Fair
    Employment Practices Act concerning religious discrimination
    may not exceed the power expressly given to the Civil Rights
    Commission by statute or the constitution, and any such guide-
    line, under the Administrative Procedures Act, does not have
    the force or effect of law, but is merely explanatory (Const
    1963, art 5, § 29; MCL 24.207[h], 423.301 et seq.; MSA
    3.560[107][h], 17.458[1] et seq.).*

13. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — CONSTITUTIONAL
    LAW — ADMINISTRATIVE LAW.

   *An administrative guideline concerning religious discrimination
   promulgated by the Civil Rights Commission under the State
   Fair Employment Practices Act is due some particular defer-
   ence because of the constitutional establishment of the commis-
   sion (Const 1963, art 5, § 29; MCL 423.301 et seq.; MSA
   17.458[1] et seq.).*

14. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
    PRACTICES ACT — REASONABLE ACCOMMODATION — BURDEN OF
    PROOF.

   *The burden of proving, under the State Fair Employment Prac-
   tices Act, that a reasonable accommodation to an employee's
   religious practices cannot be made by an employer without
   undue hardship to the conduct of the employer's business is on
   the employer (MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

15. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
    PRACTICES ACT — REASONABLE ACCOMMODATION.

   *The prohibition against religious discrimination in employment
   embraces the concept of religious practice as well as that of
   religious belief, and the Legislature necessarily included both
   concepts in the State Fair Employment Practices Act; it follows
   that a duty to make reasonable efforts to accommodate reli-
   gious practices arose with the enactment of the law in order to
   achieve fully the prohibition of religious discrimination in
   employment (US Const, Am I; Const 1963, art 1, § 4; MCL
   423.301 et seq.; MSA 17.458[1] et seq.).*

16. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT
    PRACTICES ACT — CONSTRUCTION.

   *The failure of the Legislature to amend the State Fair Employ-
   ment Practices Act specifically to incorporate the substance of
   an administrative guideline by the Civil Rights Commission
   interpreting the statutory prohibition against religious discrim-
   ination in employment does not raise the inference that the
   Legislature intended to disapprove that construction of the
   statute (MCL 423.301 et seq.; MSA 17.458[1] et seq.).*

17. CONSTITUTIONAL LAW — ESTABLISHMENT OF RELIGION — STATUTES.

   *The traditional view is that to be constitutional under the Estab-
   lishment Clause a law concerning religion must reflect a clearly
   secular legislative purpose, have a primary effect that neither
   advances nor inhibits religion, and avoid excessive governmen-
   tal entanglement with religion; that test, however, only serves*

as a guideline to identify impairments of the objectives of the Establishment Clause and does not set the precise limits to the necessary constitutional inquiry (US Const, Am I; Const 1963, art 1, § 4).

18. CONSTITUTIONAL LAW — ESTABLISHMENT OF RELIGION — STATUTES.

Total separation between church and state is not called for by the constitution, and incidental, indirect, or remote benefits to religion do not alone render a particular law constitutionally invalid (US Const, Am I; Const 1963, art 1, § 4).

19. CONSTITUTIONAL LAW — ESTABLISHMENT OF RELIGION — CIVIL RIGHTS — FAIR EMPLOYMENT PRACTICES ACT — RELIGIOUS DISCRIMINATION.

The requirement of the State Fair Employment Practices Act that an employer make reasonable accommodation to the religious practices of an employee where that can be done without undue hardship to the conduct of the employer's business is entirely consistent with the necessary governmental neutrality in matters of religion because the primary and direct effect is simply to provide certain individuals with a greater opportunity to secure or retain employment without giving up the practices of their religion; the requirement is not tainted by the evils of sponsorship, financial support, and active involvement of the government against which the Establishment Clause of the constitution was intended to afford protection (US Const, Am I; Const 1963, art 1, § 4).

20. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — REASONABLE ACCOMMODATION — QUESTION OF FACT.

The good-faith effort which an employer must make to reasonably accommodate the religious needs of an employee, as part of the proscription of the Fair Employment Practices Act against religious discrimination, cannot be given a hard and fast meaning; each case necessarily depends on its own facts and circumstances, which the trier of fact is in the best position to weigh (MCL 423.301 et seq.; MSA 17.458[1] et seq.).

21. CIVIL RIGHTS — RELIGIOUS DISCRIMINATION — FAIR EMPLOYMENT PRACTICES ACT — REASONABLE ACCOMMODATION.

An employee who was dismissed from employment because her observance of the Sabbath as a Seventh-day Adventist conflicted with her assigned hours of work has made a prima facie showing of religious discrimination against her religious needs and the need for reasonable accommodation of them under the

*State Fair Employment Practices Act where the employer took
the position that it had no duty of reasonable accommodation
to the requirement of her religion to perform no work between
sunset on Friday and sunset on Saturday (MCL 423.301 et seq.;
MSA 17.458[1] et seq.).*

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Michael A.
Lockman,* Assistant in Charge, Civil Rights & Civil
Liberties Division, for Department of Civil Rights.

*Michael J. Connolly* for defendant.

Kavanagh, J. *(for affirmance).* Judge Allen's
opinion for the Court of Appeals, 93 Mich App 366;
287 NW2d 240 (1979), fully and accurately ana-
lyzes the Michigan statute and case law and re-
counts the pertinent history of federal cases apply-
ing the comparable federal law.

For the reasons set forth in that opinion we
affirm.

Coleman, C.J., and Ryan, J., concurred with
Kavanagh, J.

Levin, J. The Civil Rights Commission found
that General Motors had discriminated against
Mary Parks because of religion. That finding was
based on stipulated facts that Parks, an observant
Seventh-day Adventist, when hired on September
18, 1972, at the Fisher Body plant in Pontiac, was
placed on a shift that included hours of her Sab-
bath (Friday evening and Saturday), that she was
discharged from employment when she failed to
report for work on three successive Fridays (Sep-
tember 22, September 29, and October 6, 1972),
and that General Motors, "upon being confronted
with the conflict between the working hours of the
second shift and claimant's observance of her Sab-

bath, considered no alternative other than claimant's discharge and took no action whatsoever other than discharge of claimant".

The circuit court reversed the decision of the CRC. The Court of Appeals affirmed; it concluded "that the FEPA did not impose an obligation on the employer to make affirmative accommodations to conform to the employee's religious needs", and directed that "[a]ll charges brought against the respondent herein [General Motors] are dismissed".

I agree that the Fair Employment Practices Act[1] does not impose a separate obligation to accommodate the religious needs of employees. An employer may nevertheless be required to act affirmatively to avoid discriminating against an employee because of religion.

I

The FEPA[2] and constitution proscribe "discrimination against any person because of religion".[3] It is the duty of the CRC, under the constitution, to investigate allegations of such discrimination "in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination".[4]

The right to an opportunity to be employed—although not absolute and subject to numerous limitations—is a civil right so guaranteed by law.[5]

[1] MCL 423.303; MSA 17.458(3).

[2] Id.

[3] Const 1963, art 5, § 29. See also Const 1963, art 1, § 2.

[4] Const 1963, art 5, § 29.

[5] See fn 1. See also Const 1963, art 1, § 2, Convention Comment, 2 Official Record, Constitutional Convention 1961, p 3363.

The term "discrimination" includes, I agree with Justices WILLIAMS and MOODY, "not only overt discrimination, but also practices that are fair in form, but discriminatory in operation". An employer may be obliged to act affirmatively to avoid a discriminatory effect.

The stipulation of facts does not advert to whether General Motors, in particular cases or as a matter of policy or practice, made changes in the work schedule, at this or other locations, so that employees can refrain from work during their days of religious observance. Nor does it appear whether GM's refusal to accommodate Mary Parks' religious needs was inconsistent with past conduct, policy or practice respecting the religious needs of General Motors employees or otherwise might have discriminated against Mary Parks on the basis of religion.

The CRC's authority concerns allegations of discrimination against a person because of religion. General Motors' concession that it refused to consider an alternative other than discharge does not, standing alone, establish a policy or practice "discriminatory in operation" or that General Motors discriminated against her because of religion.

II

In September 1972, after Parks had been hired but before she was discharged, the CRC adopted an EEOC religious discrimination guideline which stated that it concerns "the question whether it is discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or who observe certain

special religious holidays during the year and, as a consequence, do not work on such days". The guideline states that the EEOC "believes" that the duty not to discriminate on religious grounds:

"[I]ncludes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

"Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable."[6]

The CRC concluded that General Motors made no effort to accommodate Parks' religious needs, in violation of the guideline, on the basis of General Motors' concession that, when confronted with the conflict between the working hours of the second shift and Parks' observance of her Sabbath, it considered no alternative other than her discharge and took no action whatsoever other than to discharge her.[7]

Neither the FEPA nor the Michigan Constitution requires the assimilation into Michigan law of whatever the Congress enacts, federal agencies

[6] 29 CFR 1605.1.

[7] The CRC further found that General Motors was precluded from asserting undue hardship because of its failure to make any effort to accommodate Parks' religious needs, and that it could have reasonably accommodated her religious needs within the terms of the collective-bargaining agreement with the United Auto Workers without undue hardship on the conduct of its business, and failed to do so.

promulgate or the federal courts decide. The question whether a particular policy or rule of federal law should be incorporated into Michigan law should be decided as the particular issue arises.

If this Court were to adopt the EEOC guideline as a proper or the correct construction of the FEPA, the likelihood is that the argument would be made—and would prevail—that we had also adopted the federal case law construing and applying the guideline, and that the terms "reasonable accommodation" and "undue hardship" have the meaning which has been or will be ascribed to them by the EEOC or the federal courts. Some of the federal case law is conflicting. This Court has not examined that body of law, and it would be neither appropriate nor meaningful for it to attempt to do so in the instant case.[8]

The EEOC guideline may reflect a perception that large employers or employers operating large plants generally make an effort to reasonably accommodate the religious needs of employees where this can be done without undue hardship on the conduct of the employer's business and may further reflect the view that it is therefore appropriate to presume discrimination because of religion from a failure to so accommodate the religious needs of an employee and to cast the burden of justifying the failure to accommodate upon the employer. It has not, however, been shown that such a perception or view has a factual basis in

---

[8] I appreciate that, whether the EEOC guideline is adopted or not, the federal precedents are likely to be considered by the CRC in determining whether there has been discrimination as a result of a failure to act affirmatively. But then the persuasiveness of the federal precedents would depend on whether, in the case relied on, there was a factual showing of discrimination—the CRC inquiry could not be confined to whether there was "reasonable accommodation" or "undue hardship". The focus would be on whether there was discrimination, and not on the terminology of the guideline.

the experience of the EEOC or of the CRC in the administration of their responsibilities. We are asked to adopt the guideline as *the* proper construction of the statute,[9] applicable to all employers and all businesses, although there may be no basis in fact or experience for creation of such a presumption or allocation of the burden of proof.[10]

Courts ordinarily refrain from stating rules of general application until their experience in the decision of a large number of cases in varying factual situations justifies a generalization. This is the first case to reach the appellate courts of this state alleging discrimination because of religion based on asserted failure to engage in affirmative conduct to accommodate an employee's religious needs. This Court has no basis in its experience, nor has it been shown the CRC has any basis in its experience to justify the adoption of the generalizations set forth in the guideline.

Both the Michigan Department of Civil Rights and General Motors apparently desire an answer to the abstract question whether the FEPA should be read as imposing a duty of reasonable accommodation to the religious needs of employees and prospective employees where such accommodation can be made without undue hardship on the conduct of the employer's business.

I would, for reasons set forth in Judge ALLEN's opinion in the Court of Appeals, answer the ques-

[9] The guideline is, we all agree, merely an expression of agency policy. It was not adopted as a rule and does not have the force of law. See *Dep't of Civil Rights ex rel Parks v General Motors Corp,* 93 Mich App 366, 373 (1979), adopted in Justice KAVANAGH's opinion and Justice WILLIAMS' opinion in this Court.

[10] General Motors is a large employer, but the rule which the CRC asks this Court to enunciate in the construction of the FEPA would tend to impose the same burden of proof on all employers without regard to their size or the nature of their businesses and in situations distinct from those which engendered the concepts set forth in the guideline.

tion posed by this test case in the negative; the
Court has no present basis for reading the FEPA,
enacted in 1955, as imposing the duty first enunci-
ated in 1967 by the EEOC, subsequently enacted in
1972 into Title VII of the Civil Rights Act,[11] and
thereafter, in 1977, applied retroactively by the
United States Supreme Court.[12]

## III

It is my understanding of the lead opinion that
it does not preclude a finding of discrimination
based on evidence that an employer failed to act
affirmatively to avoid the discriminatory effect of a
facially neutral practice,[13] and that it leaves open
the questions whether the failure of an employer
to accommodate the religious needs of its employ-
ees or prospective employees may constitute dis-
crimination, what would be a fair allocation of the
burden of proof and what should constitute valid
defenses to evidence of discrimination.[14]

---

[11] Section 701(j), 42 USC 2000e(j).

[12] *Trans World Airlines, Inc v Hardison,* 432 US 63; 97 S Ct 2264;
53 L Ed 2d 113 (1977).

[13] While Judge ALLEN states *(Dep't of Civil Rights v General Motors
Corp, supra,* p 379) that the Court of Appeals and the United States
Court of Appeals for the Sixth Circuit have had a "long-standing
reluctance" "to find affirmative duties in a general ban on discrimina-
tion" and adverts to two decisions in which the Court of Appeals
"declined to find affirmative duties mandated within a statute which
forbids 'discrimination'", his opinion does not state, let alone hold,
that in no circumstances is there an obligation to act affirmatively to
avoid discrimination.

[14] Accommodation of an employee's Sabbath observance may in-
volve more than a request that an employer accommodate, without
undue hardship to itself, the religious needs of an employee. Accom-
modation of one employee's religious practice may necessitate the
transfer of another employee to a less desirable shift; solely because
of their religions, one employee would be moved to a more desirable
shift, and another employee would be moved to a less desirable shift.
Such a reallocation of benefits because of religion may go beyond
what is required by the FEPA and may indeed be inconsistent with
its mandate barring discrimination because of religion. Alternatively,

I would remand the cause to the circuit court for further proceedings consistent with this opinion.

WILLIAMS, J. The central issue in this case is not difficult of statement: does the duty to refrain from religious discrimination in employment impose an obligation on the employer to reasonably accommodate an employee's religious needs? Put within the general factual context of this case, we are required to determine whether an employee who refuses to work a scheduled shift because it conflicts with her religion's Sabbath observance may be summarily discharged or whether the employer must first attempt some accommodation between the work schedule and its employee's religious practices.

This conflict between employees' religious practices and employers' neutral work schedules and policies, however simple of statement, presents this Court with what Justice Marshall, in the federal context, has termed "[o]ne of the most intractable problems" arising under civil rights legislation. *Trans World Airlines, Inc v Hardison,* 432 US 63, 85; 97 S Ct 2264; 53 L Ed 2d 113 (1977) (Marshall, J., *dissenting*). On the one hand, this state's Legislature has simply prohibited an employer "to discriminate" because of religion. MCL 423.303; MSA 17.458(3).[1] It has not attempted to outline what "discriminate" means in respect to religious practices. On the other hand, the Michi-

accommodation of an employee's religious practice may not burden another employee or may not cause undue hardship to the employer if such accommodation could be accomplished through voluntary shift swaps or voluntary substitutions of other personnel already on board.

[1] This statute, the Michigan State Fair Employment Practices Act (FEPA) was repealed by passage of the Elliott-Larsen Civil Rights Act, 1976 PA 453, effective March 31, 1977, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.* The claimant in this case, Mary Parks, was discharged while the FEPA was in effect and therefore it is that statute and not the Elliott-Larsen act which governs this case.

gan Civil Rights Commission, established by the Constitution of 1963 and given the task of securing the equal protection of civil rights guaranteed by law, has interpreted the legislative prohibition of religious discrimination as requiring an employer to make reasonable accommodations to an employee's religious practices.

The difficulty of this issue is compounded by the fact that imposition of a duty of reasonable accommodation raises constitutional questions respecting an establishment of religion.[2] Courts in both the federal and state forums have grappled with both of these issues under analogous circumstances with divergent results.

After a careful review of the conflicting considerations in this sensitive area, we find that the statutory duty to refrain from religious discrimination in employment imposes a duty on the employer to reasonably accommodate an employee's religious needs unless an undue hardship would be occasioned thereby. Such a duty, moreover, does not violate either the Establishment Clause of the First Amendment to the United States Constitution or art 1, § 4 of the Michigan Constitution.

[2] US Const, Am I provides:

"Congress shall make no law *respecting an establishment of religion,* or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (Emphasis supplied.)

Const 1963, art 1, § 4 provides:

"Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. *The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."* (Emphasis supplied.)

Therefore we would reverse the Court of Appeals and the circuit court and remand to the Michigan Civil Rights Commission [MCRC] for further proceedings consistent with the above analysis. However, in light of the split in this Court and since we agree with Part III of Justice LEVIN's opinion as far as it goes, we remand to the circuit court for evidentiary proceedings. See our conclusion *infra.*

## I. FACTS

The factual background to this case is quite simple and is drawn from the stipulation of facts entered into by the parties below, on which the case has been tried by the lower courts.

Claimant Mary Parks was hired by respondent General Motors Corporation, Fisher Body Division (GM), on September 18, 1972, as an hourly employee at its Pontiac, Michigan, Fisher Body plant and placed on the second shift as an assembler in the Trim and Final Department. This shift runs from 4:00 p.m. until 12:30 a.m.

At the time of her hire claimant was a practicing Seventh-day Adventist. This religion forbids performance of work by its members between sundown Friday and sundown Saturday, which is their Sabbath. Thus on the first three Thursdays after Ms. Parks was hired she informed her foreman that she would be unable to work her following day's shift due to her religious beliefs. Accordingly, claimant failed to report to work on the three consecutive Fridays falling on September 22, September 29, and October 6, 1972. As a result of these Friday absences, Ms. Parks' employment with GM was terminated on October 9, 1972, for the stated reason that she was "unable to meet

conditions of employment". GM has stipulated that upon being confronted with the conflict between the working hours of claimant's assigned second shift and her Sabbath observance, it considered and took no action other than discharge.

Shortly after her discharge claimant filed an administrative complaint on October 19, 1972, with the Michigan Civil Rights Commission charging GM with religious discrimination. On September 8, 1975, almost three years later, the MCRC issued a formal charge of religious discrimination against GM, stating that GM had a duty to accommodate claimant in the observance of her Sabbath and that it did not do so. In an opinion and order of September 23, 1975, the MCRC found, among other things, that § 3 of Michigan's State Fair Employment Practices Act (FEPA), MCL 423.303; MSA 17.458(3), which by its terms forbids "any employer, because of the * * * religion * * * of any individual, to refuse to hire or otherwise to discriminate against him with respect to hire, tenure, conditions or privileges of employment", may be construed to require an employer to make reasonable accommodations for an employee's religious needs.[3] The MCRC further found that GM

_____

[3] On September 26, 1972, eight days after Ms. Parks was hired, the MCRC adopted interpretive guidelines on the subject of religious discrimination which construed the duty not to discriminate on the basis of religion, including an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees. These guidelines approved and adopted by reference, pursuant to MCL 24.232(4); MSA 3.560(132)(4), are similar to guidelines issued by the United States Equal Employment Opportunity Commission (EEOC) on July 13, 1967. 3 CCH Employment Practices Guide, ¶ 24,235, pp 8635-5—8635-7; BNA, Fair Employment Practice Manual 455:1091. The EEOC guidelines provide as follows:

"PART 1605—GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION

"§ 1605.1 Observation of the Sabbath and other religious holidays.

"(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to dis-

could have reasonably accommodated Ms. Parks'
religious needs in this case without undue hard-
ship on the conduct of its business but that it
made no effort to do so, thus discriminating
against claimant on account of religion. The
MCRC also concluded that its reasonable accom-
modation requirement did not violate the Estab-
lishment Clause of either the First Amendment to
the United States Constitution or art 1, § 4 of the
Michigan Constitution.[4] The MCRC ordered GM to
cease and desist from unlawfully discriminating
against Ms. Parks on account of religion and to
reinstate her with back pay and other benefits.

GM appealed the MCRC's order to the Oakland
County Circuit Court. The circuit court, trying the
appeal *de novo* pursuant to Const 1963, art 5, § 29
and MCL 37.4; MSA 3.548(4), now MCL 37.2606;
MSA 3.548(606), perceived an "obvious and signifi-
cant difference between a prohibition of religious

charge or refuse to hire employees who regularly observe Friday
evening and Saturday, or some other day of the week, as the Sabbath
or who observe certain special religious holidays during the year and,
as a consequence, do not work on such days.

"(b) The Commission believes that the duty not to discriminate on
religious grounds, required by section 703(a)(1) of the Civil Rights Act
of 1964, includes an obligation on the part of the employer to make
reasonable accommodations to the religious needs of employees and
prospective employees where such accommodations can be made
without undue hardship on the conduct of the employer's business.
Such undue hardship, for example, may exist where the employee's
needed work cannot be performed by another employee of substan-
tially similar qualifications during the period of absence of the Sab-
bath observer.

"(c) Because of the particularly sensitive nature of discharging or
refusing to hire an employee or applicant on account of his religious
beliefs, the employer has the burden of proving that an undue
hardship renders the required accommodations to the religious needs
of the employee unreasonable.

"(d) The Commission will review each case on an individual basis in
an effort to seek an equitable application of these guidelines to the
variety of situations which arise due to the varied religious practices
of the American people." 29 CFR 1605.1, as amended July 13, 1967.

[4] See fn 2, *supra*.

discrimination [found in the FEPA] and a require-
ment of accommodation to religious beliefs [found
in the interpretive guidelines]". On March 21,
1978, the circuit court reversed the order of the
MCRC and held the action of the MCRC in adopt-
ing and enforcing religious accommodation guide-
lines to go well beyond its constitutionally and
legislatively delegated authority.

On appeal to the Court of Appeals, the decision
of the circuit court was affirmed. 93 Mich App 366;
287 NW2d 240 (1979). The Court of Appeals held
that the FEPA did not impose an obligation on an
employer to make affirmative accommodations to
an employee's religious needs since the interpre-
tive guidelines of the MCRC construing that act to
require such reasonable accommodation had no
legal effect in and of themselves, and since such a
construction, in light of certain interpretive aids,
went beyond the legislative mandate set forth in
§ 3(a) of the FEPA.

We granted leave to appeal and directed the
parties to include among the issues to be briefed
whether, under the FEPA, the duty to refrain
from religious discrimination in employment im-
posed an obligation on the employer to reasonably
accommodate an employee's religious needs. 408
Mich 929 (1980).

## II. DISCUSSION

The proscription against religious discrimination
in § 3 of the FEPA states simply:

"It shall be an unfair employment practice:
"(a) For any employer, because of the race, color,
religion, national origin or ancestry of any individual,

to refuse to hire or otherwise to discriminate against him with respect to hire, tenure, terms, conditions or privileges of employment, or any matter, directly or indirectly related to employment, except where based on a bona fide occupational qualification." MCL 423.303; MSA 17.458(3).

The act does not attempt anywhere to define the term "religion". Thus, it is unclear at the start from a simple reading of the language of the statute whether the Legislature intended to impose upon an employer an obligation to make reasonable accommodations to the religious needs of employees. While courts will view an administrative "guideline" or interpretation in any number of ways, such as giving it deference, great weight, most respectful consideration, or merely looking to it for guidance, they generally do not consider it controlling. See, generally, Davis, Administrative Law of the Seventies (Supplementing Administrative Law Treatise, June, 1976), § 5.05, p 161. From the other point of view it is axiomatic that an administrative agency may not exceed the power given to it by statute or constitution, and that the "ambit of the power of the commission is in a field, meted and bound by the express provisions of the law". *McKibbin v Corporation & Securities Comm,* 369 Mich 69, 83; 119 NW2d 557 (1963), quoting from *G F Redmond & Co v Michigan Securities Comm,* 222 Mich 1, 4; 192 NW 688 (1923). Moreover, such "guidelines", under the Administrative Procedures Act, do not have the force or effect of law, but are merely explanatory. MCL 24.207(h); MSA 3.560(107)(h). Our task, then, is to construe the legislative will as we find it. *McKibbin, supra,* 81.

This issue, although one of first impression in our state, has caused no little amount of difficulty

both in the federal courts and in the courts of several of our sister states. Thus before we wrestle with this difficult problem, it will be of some benefit to examine how these other courts have dealt with this same problem of legislative silence respecting religious accommodation in the face of similarly phrased general prohibitions of religious discrimination. Consideration of the case law of other jurisdictions is also warranted since both lower courts grounded their decisions, in part, on such case law.

## A. The Federal Courts

The federal courts have had frequent opportunities to review questions dealing with religious discrimination in employment. Section 703(a)(1) of Title VII of the 1964 Civil Rights Act, 42 USC 2000e-2(a)(1), makes it unlawful for an employer

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin".

The Equal Employment Opportunity Commission (EEOC), in 1967, issued guidelines interpreting the above provision so as to oblige an employer "to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business". See fn 3, *supra.* The substance of this guideline was later incorporated into a 1972 amendment of Title VII, § 701(j), 42 USC 2000e(j), in its definition of religion.

"(j) The term 'religion' includes all aspects of reli-

gious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

What is relevant, for purposes of analogy, to this Court's present deliberations is the response of the federal courts to the EEOC guidelines interpreting Title VII's general ban of religious discrimination before those guidelines were incorporated by the 1972 Congressional amendment.

The first major case to face this issue was *Dewey v Reynolds Metals Co,* 429 F2d 324 (CA 6, 1970), *aff'd by an equally divided court* 402 US 689; 91 S Ct 2186; 29 L Ed 2d 267 (1971). While the original opinion of the Sixth Circuit panel is of doubtful precedential value due, in part, to its variety of rationales reversing the district court's ruling for the plaintiff employee who had absented himself from work due to his religious beliefs, see *Trans World Airlines, Inc v Hardison,* 432 US 63, 73, fn 8; 97 S Ct 2264; 53 L Ed 2d 113 (1977), on rehearing the majority of the panel pointedly expressed its viewpoint on the validity of the EEOC regulations.

"Nowhere in the legislative history of the Act do we find any congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. The requirement of accommodation to religious beliefs is contained only in the EEOC Regulations, which in our judgment are not consistent with the [Civil Rights] Act.

\* \* \*

"The fundamental error of Dewey and the Amici Curiae is that they equate religious discrim[i]nation with failure to accommodate. We submit these two concepts are entirely different." *Dewey, supra,* 334-335.

*Dewey,* it must be observed, was decided before the 1972 amendment to Title VII defined "religion" to include religious observances and practices and imposed a reasonable accommodation duty on the employer. *Dewey* also preceded the United States Supreme Court decision in *Griggs v Duke Power Co,* 401 US 424, 431; 91 S Ct 849; 28 L Ed 2d 158 (1971), which spoke of Title VII as proscribing "not only overt discrimination, but also practices that are fair in form, but discriminatory in operation". Further, the affirmance by an equally divided Supreme Court entitles *Dewey* to no precedential weight and its several alternative rationales, according to the Supreme Court, make its impact "inconclusive". *Trans World Airlines, supra,* 73, fn 8.

After the 1972 amendment to Title VII and the *Griggs* case later federal decisions dealing with pre-1972 employee discharges or refusals to hire started finding the 1967 EEOC guidelines on religious accommodation valid. The Courts of Appeals in the Fifth Circuit, *Riley v Bendix Corp,* 464 F2d 1113, 1116-1117 (CA 5, 1972), the Ninth Circuit, *Yott v North American Rockwell Corp,* 501 F2d 398, 402-403 (CA 9, 1974), *cert den* 445 US 928 (1980) (hereinafter cited as *Yott I)* (for subsequent case history see footnote 12, *infra),* and even in the Sixth Circuit in which *Dewey, supra,* had been decided, *Reid v Memphis Publishing Co,* 468 F2d 346, 350-351 (CA 6, 1972) (hereinafter cited as *Reid I)* (for subsequent case history see footnote 5, *infra),* all held the 1967 EEOC guideline requiring reasonable accommodation a valid interpretation of Title VII's then-applicable proscription against religious discrimination in cases involving religious objection to working on the Sabbath or to union membership and dues payment. The basis

for this result was primarily: (1) the unanimous Supreme Court decision in *Griggs, supra,* 432, which, although dealing with racial discrimination, interpreted the thrust of Title VII to be directed at the *consequences* of employment practices, not simply the motivation, *Reid I, supra,* 350; *Yott I, supra,* 402; and (2) the legislative history of the 1972 amendment (the amendment's sponsor, Senator Randolph of West Virginia, stated that the amendment was in response to the Supreme Court's equally divided affirmance of the *Dewey* case: " 'This amendment is intended, in good purpose, to resolve by legislation—and in a way I think was originally intended by the Civil Rights Act—that which the courts apparently have not resolved.' "), *Riley, supra,* 1116; *Reid I, supra,* 350-351, as well as the passage of the amendment which was hailed by these courts as having laid to rest any doubts as to the effect of the EEOC guidelines, *Riley, supra,* 1116. Indeed, the 1972 amendment was characterized as having validated or affirmed the guideline's interpretation of Title VII's ban on religious discrimination. *Riley, supra,* 1117; *Reid I, supra,* 351; *Yott I, supra,* 402-403.[5]

[5] Not all panels of the federal Court of Appeals upheld the validity of the EEOC guidelines for pre-1972 discharges decided by the appellate court after the 1972 amendment became effective. There was an apparent intra-circuit conflict in the Sixth Circuit. In the *Reid I* case the district court had entered judgment for the employer relying on *Dewey, supra,* for the proposition that the employer had no duty to a potential employee's religious belief contrary to the employer's established work schedule. The Court of Appeals panel, however, vacated this judgment, since it held the EEOC guidelines requiring such accommodation valid. That panel then remanded the case to the district court for a determination whether the employer, under the circumstances, could make reasonable accommodations to the employee's religious practices without undue hardship. *Reid I, supra,* 351.

On remand the district court this time entered judgment for the employee. On appeal a partially different Sixth Circuit panel held the district court's finding that an accommodation to the employee's religious practices would not impose an undue hardship on the employer unsupported by substantial evidence and clearly erroneous.

The United States Supreme Court pronounced the final—if not unequivocal—word on the effect of the 1967 EEOC guidelines in *Trans World Airlines, supra.* That case involved a pre-1972 dismissal of an employee due to work-schedule problems arising from the employee's observance of his religion's (Worldwide Church of God) prohibition of work during its sundown Friday to sundown Saturday Sabbath. The Supreme Court, in light of Congress' ratification of the EEOC guidelines by positive legislation, accepted the guidelines as a "defensible construction of the pre-1972 statute". *Trans World Airlines, supra,* 76, fn 11.[6]

---

*Reid v Memphis Publishing Co (After Remand),* 521 F2d 512, 517 (CA 6, 1975), *cert den* 429 US 964 (1976) (hereinafter cited as *Reid II*). The panel in *Reid II* then reverted to its *Dewey* reasoning.

"Title VII, in proscribing discriminatory practices in employment, served a legitimate and laudable legislative purpose; the 1967 EEOC Guideline 1605.1 does not. By this Guideline EEOC has injected something new and entirely different from discrimination. It has required employers not only to tolerate the religious beliefs but also all of the religious practices of their employees, no matter what they are, even though a hardship is inflicted on the employer, so long as it is not an undue hardship. The legislative history of the Act does not show anything that employers have done to warrant such treatment." *Reid II, supra,* 519.

As to the 1972 amendment to Title VII, the *Reid II* panel said simply:

"The subsequent enactment of § 2000e(j) in 1972 cannot be relied on to establish a congressional intent with respect to the 1964 statute, which was not expressed in that statute." *Reid II, supra,* 520.

The Sixth Circuit, over a dissent by Judge Edwards, who sat on the panel in both *Reid* opinions, voted against an *en banc* hearing. See *Reid v Memphis Publishing Co,* 525 F2d 986 (CA 6, 1975) *(Reid III).*

[6] The full text of this footnote reads as follows:

"Ordinarily, an EEOC guideline is not entitled to great weight where, as here, it varies from prior EEOC policy and no new legislative history has been introduced in support of the change. *General Electric Co v Gilbert,* 429 US 125, 140-145 [97 S Ct 401; 50 L Ed 2d 343] (1976). But where 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' *Red Lion Broadcasting Co v FCC,* 395 US 367, 381-382 [89 S Ct 1794; 23 L Ed 2d 371] (1969) (footnote omitted), the guideline is entitled to some deference, at least sufficient in this case to warrant our accepting the guideline as a defensible construction of the pre-1972 statute, *i.e.,* as imposing on TWA the duty of 'reasonable accommodation' in the absence of 'undue hardship.' We

## B. The State Courts

The controversy surrounding the issue of whether a duty of reasonable accommodation is properly derivable from a general prohibition of discrimination has not been confined to the federal forum. Many states, like Michigan, have legislation analogous to Title VII—prior to its 1972 amendment defining "religion"—in its general prohibition of religious discrimination and have therefore been confronted with the same issue. *Maine Human Rights Comm v Local 1361, United Paperworkers International Union, AFL-CIO,* 383 A2d 369 (Me, 1978), involved a Seventh-day Adventist's refusal, for religious reasons, to pay required union dues. That state's Supreme Court, after noting that its employment discrimination statute was intended to be the state counterpart of the federal act, relied on the just-discussed federal case law in upholding that state's Human Rights Commission guideline, which mirrored the EEOC's, as a "reasonable construction of the Maine act". *Local 1361, supra,* 378.

A similar problem was before the Alaska Supreme Court in *Wondzell v Alaska Wood Products, Inc,* 583 P2d 860 (Alas, 1978) (hereinafter cited as *Wondzell I), modified on other grounds on rehearing* 601 P2d 584 (Alas, 1979) (hereinafter cited as *Wondzell II)* (see footnote 7, *infra).* There a Seventh-day Adventist refused to join the union or pay union dues required by an applicable union security agreement. The Alaska Supreme Court, likewise, was "persuaded that a duty of reasonable accommodation should be read into the Alaska statute" which forbids discrimination on the basis of religion. *Wondzell I, supra,* 864. As in the Maine case, the Alaska court took cognizance of the fact

thus need not consider whether § 701(j) must be applied retroactively to the facts of this litigation."

that the state anti-discrimination statute was modeled on the original 1964 federal act. However, even though the Alaska statute did not itself originally contain a reasonable accommodation requirement and even though it was never amended in line with the 1972 federal amendment, the court still found a duty of reasonable accommodation to exist. *Wondzell I, supra,* 863-864 and fn 4; accord, *Wondzell II, supra,* 585.[7]

*Rankins v Comm on Professional Competence of the Ducor Union School Dist,* 24 Cal 3d 167; 154 Cal Rptr 907; 593 P2d 852 (1979), *app dis* 444 US 986 (1979), dealt with a 1974 California constitutional provision proscribing a person from being disqualified from employment because of creed. In this case an elementary school teacher had been notified of the school district's intent to dismiss him for his unexcused absences taken to observe various holy days recognized by his religious sect, the Worldwide Church of God. The California Supreme Court, after looking to federal and foreign states' case law, found the duty of reasonable accommodation implied by California's constitutional prohibition of religious disqualification from employment.

Although there is case law contrary to the imposition of a reasonable accommodation requirement, for various reasons we believe such case law to be of minimal assistance to GM's position. The decision in *Corey v Avco-Lycoming Division, Avco Corp,* 163 Conn 309; 307 A2d 155 (1972), *cert den*

---

[7] On rehearing the Alaska Supreme Court held that 1) the union's offered accommodation of dues payment without membership was unreasonable where the worker had offered a plan of substitute payment to charity, and 2) the hardship to the union in being precluded from receiving dues could not be regarded as undue where the amount was only $6.75 per month and where there was not a widespread refusal to pay dues based on religious beliefs. *Wondzell II, supra,* 586.

409 US 1116 (1973), which upheld the discharge of a Seventh-day Adventist because of time conflicts between her Sabbath and her work shift, was based primarily on the res judicata effect the Connecticut Supreme Court gave to a prior board of arbitration's denial of the employee's grievance charging her employer with religious discrimination. While that court also went on to observe that religious discrimination was entirely different from a failure to accommodate, support for this observation, as well as for its ruling on res judicata, was provided exclusively by *Dewey, supra. Corey, supra,* 322-323. *Dewey* was affirmed by an equally divided Supreme Court, thus entitling it to no precedential weight, and its impact the Supreme Court termed "inconclusive".

*Olin Corp v Illinois Fair Employment Practices Comm,* 34 Ill App 3d 868, 883; 341 NE2d 459 (1976), also involved a Seventh-day Adventist who due to his Sabbath observance could not work his assigned shift. The Illinois Fair Employment Practices Commission, at that time, had in effect religious discrimination guidelines taken directly from those of the EEOC requiring reasonable accommodation unless an undue hardship to the employer's business would be caused thereby. The Illinois Court of Appeals, however, refused to read an Illinois statute's general prohibition of discrimination due to religion as requiring the employer to accommodate the employee's religious practice.

"We find the reasoning of the majority in *Reid II* persuasive and refuse to engraft the standards embodied in the commission's guidelines onto our statute. We note that our State act has not been amended to reflect the 1972 amendment to the Civil Rights Act of 1964 regarding the definition of 'religion'." See also fn 5 *supra,* discussing *Reid II.*

On appeal to the Illinois Supreme Court the issue of whether in the absence of an explicit statutory provision employers were obligated to reasonably accommodate the religious needs of employees was avoided by that court in affirming the Court of Appeals. *Olin Corp v Fair Employment Practices Comm,* 67 Ill 2d 466, 475; 367 NE2d 1267 (1977). The Illinois Supreme Court found that even if it was assumed that the Illinois anti-discrimination law required reasonable accommodation to the religious needs of employees where it could be done without undue hardship on the employer's business, the employer in *Olin* had proved that "undue hardship rendered the requested accommodations unreasonable".

In a case dealing with a statute prohibiting discrimination based on, *inter alia,* creed, the Wisconsin Supreme Court held that the discharge of an employee who had requested time off for an eight-day religious convocation occurring in the middle of a six-month management training program was not discriminatory. *American Motors Corp v Dep't of Industry, Labor & Human Relations,* 101 Wis 2d 337; 305 NW2d 62 (1981). The court similarly rejected arguments that the Wisconsin statute required accommodation. Perceiving the central issue to be one of legislative intent, the court noted: "We do not in any way intimate that accommodation should not appropriately, or could not constitutionally, be adopted by legislative enactment. All we conclude is that the legislature in the State of Wisconsin has not yet seen fit to establish such public policy * * *." *Id.,* 351. The court went on to note that a proposed amendment to the Wisconsin Fair Employment Act would specifically provide for accommodation. "The introduction of this bill and its language is significant

in the context of the present case, because it contemplates that the failure to accommodate is an *additional* type of employment discrimination not covered in the original statute. Thus, insofar as legislative intent is concerned, the framers of this bill are of the opinion that the question of the duty to accommodate is being submitted to the legislature for consideration for the first time." *Id.,* 352. Similarly, the court repeatedly noted that the Department of Industry, Labor and Human Relations had not passed any administrative rules regarding accommodation despite its power to do so. *Id.,* 354-355, 364, and 367. Thus the primary consideration in *American Motors* was the legislative and administrative void concerning accommodation and not interfering with the legislative process. In the case at bar, however, the MCRC has spoken, albeit through interpretive guidelines rather than rules.[8] The Michigan Legislature has had the opportunity to set aside these guidelines but has chosen not to.

GM cites in its brief another case which it feels favors its position. In *International Harvester Co Parts Depot v Lamb* (Ct of Appeals, Franklin County, Ohio), Civil Action No 76AP-598 (1977), the Ohio Civil Rights Commission had promulgated guidelines interpreting its generally phrased anti-discrimination law to require an employer to accommodate an employee's religion in a manner least burdensome to that employee unless such accommodation is excused due to business necessity. That court, relying on *Reid II,* fn 5 *supra,*

---

[8] The Court of Appeals correctly distinguishes between interpreting guidelines and administrative rules. See 93 Mich App 372-374; 287 NW2d 242-243. Although interpretive guidelines may not have the same force as administrative rules, MCL 24.207(h); MSA 3.560(107)(h), both give notice to the Legislature of the policy considerations of the MCRC. Thus failure to suspend or set aside such guidelines may be considered as legislative acquiescence.

found the guidelines invalid because they expanded or modified the underlying statute. This finding, however, was not necessary to the court's decision since it seems the employer did make efforts to accommodate the employee but could not do so successfully within the confines of the applicable collective-bargaining agreement without serious business hardships. Further, the court found that even if the guidelines were valid they were not applicable to the case since they had been passed more than nine months after the alleged act of discrimination. In addition, this is an unreported case and, therefore, may only be used as precedent in Ohio Tenth District Court of Appeals. See *State v George,* 50 Ohio App 2d 297; 4 Ohio Op 3d 259; 362 NE2d 1223 (1975). See also *Keener v Ridenour,* 594 F2d 581 (CA 6, 1979).

*C. A Duty of Reasonable Accommodation in Michigan?*

We think it obvious that none of the federal and state case law just reviewed provides an honest, on-all-fours answer to the question presently before us. While the federal precedents are helpful to a general understanding of the problems inherent in this general area of civil rights law, the 1972 amendment to Title VII incorporating the EEOC's guideline on reasonable accommodation has rendered the federal body of case law unsuited to Michigan's particular situation where no comparable legislative affirmation has taken place. We cannot just ignore the fact that most of the federal case law in this area was developed after the 1972 amendment and in upholding the pre-1972 validity of the reasonable accommodation guidelines those courts had the luxury of the safety net that that amendment provided. Also, the Supreme Court's equivocal language in footnote 11 of *Trans World*

*Airlines, supra,* counsels against an exclusive and unfettered reliance on the federal case law.[9]

The same general caution exists with respect to any reliance on other states' interpretation of their own statutes or constitutions. Each state's ban on religious discrimination, while in form much like that of Michigan's FEPA, was adopted under different circumstances and exists within a different system. For example, Maine's and Alas-

---

[9] Such a recognition serves to render futile much of the legal thrust and parry of the parties concerning the effect various federal and state legislative actions and inactions should have on the correct construction of the FEPA. For example, appellant Michigan Department of Civil Rights thrusts by asserting that the 1972 Congressional amendment of Title VII which defined "religion" in terms of a reasonable accommodation requirement essentially validated the existence of the duty to accommodate imposed by Title VII itself prior to its amendment. Appellant thus asserts that *Trans World Airlines, supra,* stands for the proposition that the duty to accommodate arose by virtue of the prohibition against discrimination, and not because of the amendatory legislation, and this Court should therefore render a similar construction of the FEPA.

Appellee GM parries by stating that the 1972 Congressional amendment to Title VII is compelling evidence that Congress did not intend an accommodation requirement in the original 1964 act. The amendment validated the EEOC guidelines and not, per the appellant, any *ab initio* Title VII duty to accommodate. Further, *Trans World Airlines* did not decide that a duty of accommodation existed under Title VII prior to the 1972 amendment. Rather, the Supreme Court merely gave the guidelines "some deference" due to Congress' affirmation of them via the 1972 amendment.

GM then counter-thrusts by arguing the inapplicability of *Trans World Airlines* in regard to giving effect to the MCRC's own guidelines requiring reasonable accommodation since the Michigan Legislature, unlike Congress, has not ratified the guidelines by positive legislation. Appellant in turn counters this by observing that the Michigan Legislature, unlike Congress, had no need to do so since it was not faced with a state court's interpretation of the FEPA which, like *Dewey,* implied that no duty to accommodate existed. GM, again taking the offensive, notes that Michigan's Legislature has apparently responded to restrictive federal decisions dealing with civil rights in the past by broadening them, as when it amended the Elliott-Larsen Civil Rights Act so as to broaden "sex" to include pregnancy and child-birth, MCL 37.2201(d); MSA 3.548(201)(d), apparently in response to *General Electric Co v Gilbert,* 429 US 125; 97 S Ct 401; 50 L Ed 2d 343 (1976). Thus its failure to amend the FEPA in light of *Dewey* supports the inference that an accommodation duty was not intended.

ka's statutes were adopted after Title VII's enactment and thus those states' supreme courts have expressly placed heavy reliance in matters of statutory construction on their statutes' federal counterparts. California's applicable prohibition is not statutory, but rather is part of its constitution and was also adopted after Title VII. On the other hand Wisconsin's statute prohibiting religious discrimination is like Michigan's in its predating of Title VII. Further, some states such as Maine and Wisconsin have administrative agencies akin to the MCRC, but whereas Maine's, like Michigan's, has promulgated guidelines reflecting those of the EEOC, Wisconsin's has not.

However, while we are certainly not controlled by such case law from other jurisdictions, we can be guided by it when it is determined to be appropriate and sound. In this regard we cannot ignore the fact that despite the dissimilar circumstances under which the cases just reviewed were decided, a common thread can be found running through those cases which have upheld the requirement of reasonable accommodation to the religious needs of employees. That thread is the concern of the courts that discriminatory *consequences* of employment practices facially neutral or fair in form be eliminated unless an undue hardship would thereby be placed on the employer's business. This interpretation of "discrimination" to include not only overt discrimination but also practices that are fair in form, but discriminatory in operation, was first advanced by the United States Supreme Court in *Griggs, supra,* 431, a case dealing with racial discrimination. The applicability of such an interpretation to religious discrimination has been grounded—at least in the federal forum—on the fact that the Equal Employment statute treats

racial and religious discrimination similarly. As the *Reid* court noted:

"The prohibitions against both forms of discrimination (and the exceptions thereto) are usually contained in the same sentences in the statute." 468 F2d 350. See also *Yott I, supra,* 402-403.

State courts have likewise looked to *Griggs* in interpreting their general prohibitions of religious discrimination to include a duty of reasonable accommodation. In *Local 1361, supra,* 373, the Maine Supreme Court looked explicitly to *Griggs* in rejecting the union's argument that it had requested the dismissal of an employee because she did not pay her union dues, and not because of her religion. The court observed, after noting the broad terms in which "discrimination" was used in its act, that

"we find nothing in the Maine act which suggests that the Legislature intended it to apply to the limited situation, typically devoid of proof, that an employer or labor organization intends to discriminate. As in *Griggs v Duke Power Co, supra,* the touchstone of our statutory prohibition is whether in fact the disputed practice results in unlawful employment discrimination." *Local 1361, supra,* 375.

Likewise, the Supreme Court of California, in reliance on *Griggs,* interpreted the constitutional provision at issue in *Rankins, supra,* 172, to forbid "not only overt religious discrimination but also qualifications for employment that are discriminatory in effect". Further, although *Griggs* spoke in terms of "business necessity" as validating a practice fair in form but discriminatory in effect, *Griggs, supra,* 431, the Alaska Supreme Court, in reading a duty of reasonable accommodation into

its statute prohibiting religious discrimination, opined that the touchstones of such a duty—"reasonable accommodation" and "undue hardship"— are in fact derivable from the *Griggs* "business necessity" test and are "really exemplary of the statute's general purpose of preventing unreasonable discrimination in employment". *Wondzell I, supra,* 864, fn 4.

We find persuasive the reasoning of the above courts in their refusal to ignore the discriminatory effects of employer practices or policies that are overtly neutral. Such a decision, however, is best tempered by the recognition, by the reasoning in *Griggs, supra,* that certain circumstances should excuse the imposition of truly facially neutral rules. We find sound the reasoning of those federal and state courts which have upheld the EEOC guidelines or the guidelines or interpretations of appropriate state commissions modeled after those of the EEOC that require a duty of reasonable accommodation and allow undue hardship as a defense to such a duty as a valid and reasonable construction of a general prohibition of religious discrimination in employment. See *Reid I, supra,* 350-351; *Wondzell I, supra,* 864, fn 4; *Local 1361, supra,* 378.

While we have reached our conclusion by endeavoring to deduce the legislative intent, we are not unmindful that our conclusion is given additional strength by a different analysis. It can be not unreasonably argued, while we did not do so in our own analysis heretofore, that because the Civil Rights Commission has a particular constitutional genesis, its actions have more than the usual statutory authority and that the regulation in question is due some particular deference.

Article 5, § 29 of the 1963 Michigan Constitution states:

"There is hereby established a civil rights commission * * *. It shall be *the duty* of the commission in a manner which may be prescribed by law *to investigate* alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, *and to secure the equal protection* of such civil rights without such discrimination." (Emphasis added.)

In *Beech Grove Investment Co v Civil Rights Comm,* 380 Mich 405; 157 NW2d 213 (1968), a majority of this Court agreed that

"*the duty* of the commission to investigate alleged discrimination and to secure the equal protection of civil rights without such discrimination *was created by the constitutional provision itself.* The manner may be prescribed by law but *the authority to act lies with* the *commission whether the manner is or is not so prescribed.*" (Emphasis added.) 380 Mich 419 (plurality opinion by ADAMS, J.). See 380 Mich 442 (SOURIS, J., *concurring).*

Therefore, the Michigan Civil Rights Commission, deriving its power in part from the state constitution as well as from the Legislature and empowered to investigate discrimination and secure the equal protection of civil rights, should be given deference in the performance of its duties. We therefore hold that the FEPA's proscription of religious discrimination entails the obligation, on the part of the employer, to make reasonable accommodation to the religious needs of employees or prospective employees where such can be done without undue hardship on the conduct of the employer's business. The burden of proving that a reasonable accommodation cannot be made without such undue hardship is on the employer.

Such a construction of FEPA's prohibition against religious discrimination also accords more fully, we think, with the purpose of the FEPA to

"promote and protect the welfare of the people of this state by prevention and elimination of discriminatory employment practices and policies based upon * * * religion". 1955 PA 251. To require an employer to attempt reasonable accommodation to an employee's religious needs absent undue hardship both encourages and fosters to the full extent practicable the employment of all properly qualified persons regardless of their religion and to that extent certainly promotes the common weal. This reading of FEPA is also consonant with our policy of liberally construing remedial legislation. See *In re School Dist No 6,* 284 Mich 132, 144; 278 NW 792 (1938). See also *White v Motor Wheel Corp,* 64 Mich App 225, 230-231; 236 NW2d 709 (1975).

It is fundamental to recognize that the prohibition against religious discrimination in employment embraces not only the concept of religious *belief* but that of religious *practice* as well. Religion not only encompasses a belief but also a practice of the faith in which one believes. To afford protection only to the right of religious belief ignores the basic right of religious conduct. In *Cantwell v Connecticut,* 310 US 296, 303; 60 S Ct 900; 84 L Ed 1213 (1940), it was recognized that the First Amendment "embraces two concepts,— freedom to believe and freedom to act".[10]

---

[10] While one has an absolute and inalienable right to freedom of belief, freedom to act, by the necessity of social living, must be tempered. As the United States Supreme Court noted: "Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." *Cantwell, supra,* 304. This principle has been expressed in the area of freedom of religious activity in such cases as *State ex rel Swann v Pack,* 527 SW2d 99 (Tenn, 1975), *cert den* 424 US 954 (1976) (perpetually enjoining and restraining the handling of venomous snakes or drinking poison even as part of a religious ceremony); *State v Massey,* 229 NC 734; 51 SE2d 179 (1949), *appeal*

Neither concept can be ignored. Freedom to act is an integral part of the right of religious freedom. Accordingly, when the Michigan Legislature enacted the FEPA proscribing discrimination against religion, it necessarily included both concepts. Without this realization, the thrust of the statute loses half of its meaning. It follows, therefore, that in order to fully achieve the prohibition against religious discrimination in employment, as mandated by the FEPA, a duty to make reasonable efforts to accommodate religious practices arose with the enactment of the law. Finally, the failure of the Legislature to specifically amend the statute, as the Congress did, to incorporate the substance of the guideline does not raise the contrary inference that the Legislature intended to disapprove that construction. See *Wondzell I, supra,* 863-864.

## III. ESTABLISHMENT CLAUSE CONSIDERATIONS

Appellee GM contends that a construction of the FEPA that finds an affirmative duty on the part of the employer to reasonably accommodate an employee's religious needs unless undue hardship can be shown would violate the Establishment Clause of the First Amendment to the United States Constitution[11] and art 1, § 4 of the Michigan Con-

---

*dismissed for want of substantial federal question sub nom Bunn v North Carolina,* 336 US 942 (1949) (city ordinance prohibiting the handling of poisonous reptiles does not violate freedom of religious worship). *Cf. People v Woody,* 61 Cal 2d 716; 394 P2d 813 (1964) (statute proscribing use of peyote could not constitutionally be applied to prevent Indian tribe from using peyote in religious ceremony); *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972) (mandatory education laws held inapplicable past eighth grade to members of the Amish faith).

[11] The First Amendment of the federal constitution is made applicable to the states through the Fourteenth Amendment. *Cantwell v Connecticut,* 310 US 296, 303; 60 S Ct 900; 84 L Ed 1213 (1940).

stitution by obliging it to treat its employees disparately based solely on religious considerations.

This constitutional issue is both complex and difficult, and like the previous issue, has caused the courts of both the state and federal forums which have considered it no small amount of difficulty, attested to, in part, by the differing results reached by those courts. Indeed, appellate courts have not been loath to avoid reaching the issue whenever possible.[12] Despite the difficulty of the issue, however, we feel we cannot properly avoid it. In its answer to the MCRC's charge, GM asserted as its fourth affirmative defense the unconstitutionality of any reasonable accommodation requirement. The opinion of the MCRC held such an assertion to be without merit; the trial court, on the other hand, found the MCRC's reasonable accommodation guideline to contain substantial constitutional implications.

Further, the factual posture of the case makes the issue unavoidable. For GM this is admittedly a test case. It has not attempted in any way whatsoever to accommodate Ms. Parks' religious needs, nor has it attempted to prove with record support

[12] See, *e.g., Gavin v Peoples Natural Gas Co,* 613 F2d 482, 484-485 (CA 3, 1980) (the court remanded for a determination of whether reasonable accommodation had, in fact, been made by the employer); *Yott v North American Rockwell Corp,* 602 F2d 904, 906 (CA 9, 1979), *cert den* 445 US 928 (1980) (hereinafter cited as *Yott II*) (the court found not clearly erroneous the trial court's alternate holding, offered in a supplementary opinion, that reasonable accommodation was not possible); *Anderson v General Dynamics Convair Aerospace Division,* 589 F2d 397, 402, fn 5 (CA 9, 1978), *cert den sub nom International Ass'n of Machinists & Aerospace Workers, AFL-CIO, Silvergate Dist Lodge 50 v Anderson,* 442 US 921 (1979) (hereinafter cited as *Anderson I*) (the district court had not reached the constitutional issue); *Redmond v GAF Corp,* 574 F2d 897, 904, fn 17 (CA 7, 1978) (the constitutional issue was not raised below).

that it can do nothing to help claimant because of a resulting undue hardship to its business. Thus these alternate, factual avenues of resolution are at this point foreclosed to us.

Finally, and most importantly, the parties have had a chance to fully express their viewpoints on this issue—GM in its brief to this Court and the MCRC in its oral argument before us. Thus, although the Court of Appeals did not need to reach the constitutional issue due to its interpretation of the FEPA, we feel that issue is properly before us.

A look at the results of the other courts which have preceded us in deciding this difficult and sensitive issue serves to perplex as much as to inform. Each court to consider the issue has approached it more or less through the now well-known three-part test that the United States Supreme Court has established over the years in dealing with Establishment Clause issues. See *Committee for Public Education & Religious Liberty v Nyquist,* 413 US 756, 772; 93 S Ct 2955; 37 L Ed 2d 948 (1973). To pass constitutional muster under the Establishment Clause the law in question first, must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and third, must avoid excessive government entanglement with religion. *Id.,* 773. In a word, neutrality is what is required of the state. *Roemer v Board of Public Works of Maryland,* 426 US 736, 747; 96 S Ct 2337; 49 L Ed 2d 179 (1976). Yet despite the same approach to the issue, the results of the courts have been anything but uniform. In the federal forum where the discussion centers on the constitutionality of the 1972 amendment to Title

VII, the district courts have split on the issue,[13] while all three federal courts of appeals to confront it on the merits have come out in favor of its constitutionality, although accompanied by dissents.[14] Of the state courts mentioned as requiring reasonable accommodation, only the California Supreme Court in *Rankins, supra,* has passed on the issue, finding the requirement not violative of the Establishment Clause. The United States Supreme Court, as will be discussed *infra,* has yet to make an explicit pronouncement on the matter.

Although we do not have the comfort of a clear and convincing majority rule on this issue which by its persuasiveness as well as its force of numbers would ease the decisional process, we are confident, after considerable research and contemplation, that a reading of the FEPA's general prohibition of religious discrimination to require reasonable accommodation by the employer to the employee's religious needs does not violate either the federal or this state's constitution.

In reaching this decision we have looked for

---

[13] The 1972 amendment (§ 701[j] of Title VII) has been held constitutional in North Carolina, *Jordan v North Carolina National Bank,* 399 F Supp 172, 179 (WD NC, 1975), *rev'd on other grounds* 565 F2d 72 (CA 4, 1977), and Missouri, *Brown v General Motors Corp,* 20 FEP Cases (BNA) 88 (WD Mo, 1978), *rev'd on other grounds* 601 F2d 956 (CA 8, 1979). Findings of unconstitutionality have come from the Pennsylvania district court. *Gavin v Peoples Natural Gas Co,* 464 F Supp 622, 632 (WD Pa, 1979), *vacated and remanded on other grounds* 613 F2d 482 (CA 3, 1980).

[14] *Tooley v Martin-Marietta Corp,* 648 F2d 1239 (CA 9, 1981), *cert den sub nom United Steel Workers of America v Tooley,* 454 US 1098 (1981); *Anderson v General Dynamics Convair Aerospace Division,* 648 F2d 1247 (CA 9, 1981) (hereinafter cited as *Anderson II*). *Cummins v Parker Seal Co,* 516 F2d 544 (CA 6, 1975), *vacated on other grounds* 561 F2d 658 (CA 6, 1977), *Nottelson v Smith Steel Workers DALU 19806,* 643 F2d 445 (CA 7, 1981), *cert den* 454 US 1046 (1981).

guidance, like the courts which have preceded us in similar cases, to the substantial body of United States Supreme Court case law on the Establishment Clause. We think such a course appropriate since this Court has previously acknowledged the similarities between the federal constitution's Free Exercise and Establishment Clauses and art 1, § 4 of this state's constitution, with the consequence that they are subject to similar interpretation.

"Taken together, these sentences [art 1, § 4] are an expanded and more explicit statement of the establishment and free exercise clauses of the First Amendment to the United States Constitution, the first and fourth sentences constituting the free exercise clause, and the second and third sentences constituting the establishment clause. They are, accordingly, subject to similar interpretation." *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82, 105; 180 NW2d 265 (1970).[15]

We are also aware that the United States Supreme Court itself has noted that the tripartite test which it has developed for Establishment Clause issues is only intended to serve as a guideline with which to identify instances in which the objectives of the Establishment Clause have been impaired, and "must not be viewed as setting the precise limits to the necessary constitutional inquiry". *Meek v Pittenger,* 421 US 349, 359; 95 S Ct 1753; 44 L Ed 2d 217 (1975). See also *Tilton v Richardson,* 403 US 672, 678; 91 S Ct 2091; 29 L

---

[15] We think the fourth sentence of this section might be more properly construed as containing both a free exercise (one's rights cannot be *diminished* on account of religious belief) and an establishment (one's rights cannot be *enlarged* on account of religious belief) component.

Ed 2d 790 (1971).[16] In using this test then as our Baedeker to this area, we must not forget the general lay of the land in which we are traveling. As was noted in *Walz v Tax Comm of New York City,* 397 US 664, 668-669; 90 S Ct 1409; 25 L Ed 2d 697 (1970),

"The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute. * * * The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other. * * * The course of constitutional neutrality in this area cannot be an absolutely straight line."

That this constitutionally required "neutrality" does not demand an unyielding and absolute rigidity, the slightest deviation from which is proscribed, was made clear in *Walz, supra:*

"The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a *benevolent neutrality* which will permit religious exercise to exist without sponsorship and without interference." *Id.,* 669 (emphasis supplied).

See also *Sherbert v Verner,* 374 US 398, 415-416, 422-423; 83 S Ct 1790; 10 L Ed 2d 965 (1963) (Stewart, J., *concurring in result,* Harlan, J., *dis-*

---

[16] Apparently, this three-part test now only receives the express endorsement of a plurality of the United States Supreme Court. See *Wolman v Walter,* 433 US 229; 97 S Ct 2593; 53 L Ed 2d 714 (1977). Nonetheless, we believe it remains a useful guideline in this complex area.

*senting).* In short, total separation between church and state is not called for, nor is it possible in an absolute sense; some relationship between government and religious organizations is inevitable. *Lemon v Kurtzman,* 403 US 602, 614; 91 S Ct 2105; 29 L Ed 2d 745 (1971). Incidental, indirect, or remote benefits to religion do not alone render a particular law constitutionally invalid. *Nyquist, supra,* 771.

"[T]he line between state neutrality to religion and state support of religion is not easy to locate. 'The constitutional standard is the separation of Church and State. The problem, like many problems in constitutional law, is one of degree.'" *Board of Education of Central School Dist No 1 v Allen,* 392 US 236, 242; 88 S Ct 1923; 20 L Ed 2d 1060 (1968), quoting from *Zorach v Clauson,* 343 US 306, 314; 72 S Ct 679; 96 L Ed 954 (1952).

With these thoughts in mind, we turn to a consideration of the Supreme Court's three-part test relating to the Establishment Clause.

*A. Secular Purpose*

The purpose of the FEPA's prohibition of religious discrimination and the reasonable accommodation requirement we have inferred in such a prohibition is to prevent discrimination in employment based on the legally irrelevant factor of religion. In other words, the purpose is to promote equal employment opportunities for members of all religious faiths, *Rankins, supra,* 178, and not to advance one religion over another or religion in general over non-religion. By requiring an employer to attempt reasonable accommodation of an employee's religious needs unless undue hardship would result to the employer's business, those who might have been unable to find or retain suitable

employment due to an otherwise facially neutral work policy which conflicted with their religious tenets may now be able to join or stay in the work force without doing violence to their religious convictions. As the Court of Appeals for the Seventh Circuit noted under the federal act, a secular purpose inheres in the law's intent to "relieve individuals of the burden of choosing between their jobs and their religious convictions where such relief will not unduly burden others". *Nottelson v Smith Steel Workers DALU 19806*, 643 F2d 445, 454 (CA 7, 1981), *cert den* 454 US 1046 (1981). As we noted earlier, the reasonable accommodation requirement fosters the employment of all properly qualified persons. We conclude therefore that the purpose of such a requirement is truly a secular one.

*B. Primary Effect*

This prong of the three-part test requires us to determine whether in the present situation the primary effect of the reasonable accommodation requirement is to advance religion. This question is not easy to resolve since there is a good deal of logic to the position that since reasonable accommodation is based solely on religion, the requirement favors religion over non-religion, and favors some religions over others since only those religions which manifest their beliefs in acts requiring modification of an employer's work rules are benefited. See *Cummins v Parker Seal Co*, 516 F2d 544, 558 (CA 6, 1975) (Celebrezze, J., *dissenting*); *Gavin v Peoples Natural Gas Co*, 464 F Supp 622, 629 (WD Pa, 1979).

Were we to interpret the requirement of reasonable accommodation as obliging the employer to treat employees unequally solely on the 'basis of their religions so as to require an employer to

discriminate against some employees in order to accommodate or prefer the religious needs of others or to bear additional costs for an employee's religious needs when no such costs are incurred for other employees' religious needs, we might well run afoul of the Establishment Clause. However, we feel that *Trans World Airlines, supra,* obviates these anticipated problems. See Wheeler, *Establishment Clause Neutrality and the Reasonable Accommodation Requirement,* 4 Hastings Constitutional L Q 901, 903 (1977).

We believe that an interpretation of the reasonable accommodation requirement that disallows treating employees unequally on the basis of religion can hardly be said to have the primary effect of advancing religion to any significant extent. The effect, rather, would be to restrain employers from enforcing uniform, facially neutral work rules that have a discriminatory effect on certain employees due to their religious beliefs and practices, thus guaranteeing job security except when accommodation of an employee's religious needs would impose an undue hardship (as that term has been interpreted in *Trans World Airlines)* upon the employer's business. "It [the reasonable accommodation requirement of Title VII] does not confer a benefit on those accommodated, but rather relieves those individuals of a special burden that others do not suffer by permitting them to fulfill their societal obligations in a different manner * * *." *Nottelson, supra,* 454. While it may be argued that the reasonable accommodation requirement may benefit some religions as, for example, through a larger attendance at scheduled religious services which might otherwise be missed due to work schedules and therefore the receipt by those churches of "a correspondingly fuller collection

plate", *Cummins, supra,* 516 F2d 553, we believe such benefit to be incidental to the requirement's primary effect of preventing religious discrimination and guaranteeing equal employment opportunities to members of minority religions.

## C. Excessive Entanglement

The third prong of the test requires the avoidance of excessive governmental entanglement with religion. The danger here is that an employee's expressed desire to have his or her employer accommodate his or her religious needs will eventually involve the government, via the MCRC and the courts, in determining the validity of the religious nature of the employee's claims, as well as the sincerity of the religious beliefs claimed to be held by the employee. It was just such a concern that formed the explicit basis for one federal district court's determination that § 701(j) of Title VII was unconstitutional. *Gavin, supra,* 464 F Supp 632. In that case there existed a controversy as to whether an employee could be required to raise and lower the American flag as part of his job. The employee, a Jehovah's Witness, claimed such a task was in violation of his religious belief against worshipping false idols. The trial court believed that a determination of whether the employee's belief could in fact be characterized as a "religious" one, and whether such a belief, which may be outside the standardized creed of his faith, was still protected under Title VII, would necessarily lead the court into an excessive entanglement with religion.

Although this concern is certainly legitimate, to find the law unconstitutional on this basis would be imprudent. First of all, the religious validity of claimant's beliefs, as well as the sincerity in which they are held, are not questioned in this case.

Secondly, a quick review of the decided case law relevant to this issue will disclose that the *Gavin* situation is quite unusual. Most of the cases involving a conflict between an employee's religious beliefs or practices and a work requirement usually concern the necessity to be absent from work in order to observe a Saturday Sabbath, a holy day, or to attend a compulsory religious meeting, or an inability to join a union or pay union dues pursuant to a union security clause.[17] See, *e.g.*, *Cummins* (Saturday Sabbath); the *Reid* cases (Saturday Sabbath); *Rankins* (absences for holy days); the *Yott* cases (union security clause); the *Anderson* cases (union security clause); *Local 1361* (union security clause); the *Wondzell* cases (union security clause). Most often in these types of cases, as in the present one, neither the sincerity of the employee's beliefs nor the religious validity of the belief or practice will be contested. We agree with the observation made in this regard in the context of Title VII in *Cummins, supra,* 516 F2d 554:

> "Appellee suggests, however, that EEOC investigators will be forced to study and to evaluate the dogma of the many religious sects in order to ascertain whether employees' practices and observances are genuinely religious and therefore protected under Title VII. In most cases, this issue probably will not be disputed seriously. To the extent that the question does arise, however, we think that it will require no more government involvement in religion than the concededly nonexcessive entanglement that occurs when a state must determine whether a purported church qualifies for a property tax exemption. See *Walz v Tax Comm,* 397 US

---

[17] A 1980 National Labor Relations Act amendment, PL 96-593, exempts employees belonging to a "bona fide religion, body, or sect which has historically held conscientious objections to joining or financially supporting labor organizations" from paying union dues, while allowing bargaining agreements to require that such employees contribute a sum equal to union dues to a nonreligious charity.

664, 674-676 * * *; *id.,* 698-699 (opinion of Harlan, J.)."
*Cf. Nottelson, supra,* 455 (conscientious objector exemption of selective service statutes involves a similar type of determination).

Further, in cases such as *Wisconsin v Yoder,* 406 US 205, 216, 235; 92 S Ct 1526; 32 L Ed 2d 15 (1972), the Supreme Court has recognized the necessity of examining religious beliefs and the sincerity with which they are held in order to accord certain individuals free exercise rights over otherwise contrary state law. Without some recognition of the religious nature of the asserted conflict with public school education past the eighth grade in *Yoder,* the Supreme Court there could not have excused the Amish in that case from the state-imposed requirement of compulsory school attendance until the age of 16. See Note, *Is Title VII's Reasonable Accommodations Requirement a Law "Respecting an Establishment of Religion"?,* 51 Notre Dame Lawyer 481, 483-484 (1976). We therefore conclude that the reasonable accommodation requirement that we have read into the FEPA does not produce an excessive entanglement between government and religion.

*D. Overall Neutrality*

In sum, we think a reading of the FEPA's prohibition of religious discrimination that requires an employer to make reasonable accommodation to the religious needs of his employees unless undue hardship would result is entirely consistent with the necessity of government neutrality respecting matters of religion. Such a requirement is the type of "play in the joints productive of a benevolent neutrality" that the Supreme Court spoke of in *Walz, supra,* 669. As Justice Douglas wrote in

*Zorach v Clauson,* 343 US 306, 313-314; 72 S Ct 679; 96 L Ed 954 (1952):

"We are a religious people * * *. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. * * * [A state acts properly when it] respects the religious nature of our people and accommodates the public service to their spiritual needs."

The indirect benefit which certain religions may receive under our reading of the FEPA is qualitatively and quantitatively different from that most often found objectionable in Establishment Clause cases. First, we think it constitutionally significant that the reasonable accommodation requirement here at issue primarily benefits individuals, not institutions. See *Nyquist, supra,* 801 (Burger, C.J., *concurring in part, dissenting in part).* See also *Jordan v North Carolina National Bank,* 399 F Supp 172, 180 (WD NC, 1975), *rev'd on other grounds* 565 F2d 72 (CA 4, 1977). The minimal assistance given to individuals in securing or retaining employment, through the enhancement of their right of free exercise by the reasonable accommodation requirement, is far from the type of individual aid which the Supreme Court has proscribed as having the primary effect of advancing religion. We are not dealing with aid that in its effect is analogous to a state's attempt to directly alleviate a parent's burden in sending his or her child to parochial school through the use of tuition grants or tax benefits. In such a case the religious mission of the parochial school is so intertwined with the secular education it provides, that aid to the parent which better enables him or her to

send the child there has the unmistakable effect of providing financial support to the sectarian institution which the child attends. *Nyquist, supra,* 783, 791. The primary and direct effect in this case, in contradistinction, is simply to provide individuals with a greater opportunity to secure or to remain employed in jobs where their religion is not a bona fide occupational qualification for the job, but rather presents a hindrance to the securing or maintaining of it because of a conflict between required practices of the religion and the neutral work schedule or policies of the employer. The thrust of the requirement is directed at the employment of individuals and not at the survival of institutions charged with a religious mission. Any aid filtering to a particular religion or to religion in general from the imposition of the reasonable accommodation requirement is too indirect and remote to be constitutionally significant.

Second, the type of aid given to the employee is also significant. Here there is no direct financial support given to an individual on account of his religious beliefs or to a religious institution. Nothing as tangible as instructional materials and equipment, *Meek, supra,* 366, textbooks, *Wolman v Walter,* 433 US 229, 258-259; 97 S Ct 2593; 53 L Ed 2d 714 (1977) (Marshall, J., *dissenting),* or standardized tests, *Wolman, supra,* 240-241 (plurality opinion) is provided. Rather the employer must merely seek to reasonably accommodate an employee's religious needs unless an undue hardship would be occasioned thereby on his business.

Although this case does not present us with the issue of whether the Free Exercise Clause compels the reasonable accommodation requirement, we believe that the Establishment Clause certainly does not prohibit such a requirement. As the

United States Supreme Court stated in the context of passing on the conscientious objector provision of the Military Selective Service Act of 1967: "Quite apart from the question whether the Free Exercise Clause might require some sort of exemption, it is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with 'our happy tradition' of 'avoiding unnecessary clashes with the dictates of conscience.' " *Gillette v United States,* 401 US 437, 453; 91 S Ct 828; 28 L Ed 2d 168 (1971) (footnote omitted). See also *Trans World Airlines, supra,* 90-91 (Marshall, J., *dissenting); Nottelson, supra,* 454. This is consonant with the Supreme Court's earlier statement in *Zorach, supra,* 314, to the effect that

"we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."

Indeed, we feel this case somewhat analogous to that of *Zorach, supra.* In *Zorach* the United States Supreme Court upheld the "released time" program of New York City as a constitutional effort of the public schools to "accommodate their schedules to a program of outside religious instruction", *Zorach, supra,* 315. Under this program a public-school student, on written request of his or her parents, could be released from school for one hour a week to attend religious instruction or devotional exercises off the school grounds. We feel, similarly, that requiring employers to attempt a reasonable accommodation of their business to the religious needs of their employees does not breach the required wall of separation between church and state. To hold such a required attempt to accommodation unconstitutional "would be to find

in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe". *Zorach, supra,* 314. In short, we do not find the reasonable accommodation requirement impermissibly tainted by the evils of " 'sponsorship, financial support, and active involvement of the sovereign in religious activity' " against which the Establishment Clause was intended to afford protection. *Lemon, supra,* 612.

We close by making clear that this Court does not intend to impart any definitive opinion on the degree of accommodation that may be required of an employer in a particular case. As one federal court of appeals has noted:

"The term 'reasonable accommodation' is a relative term and cannot be given a hard and fast meaning. Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of 'reasonableness' under the unique circumstances of the individual employer-employee relationship. The trier of fact is in the best position to weigh these considerations." *Redmond v GAF Corp,* 574 F2d 897, 902-903 (CA 7, 1978).

For our present purposes, however, it seems clear that an employer, in response to the communicated religious needs of its employee, must at least make some good-faith effort at accommodation and, if those efforts are unsuccessful, demonstrate that it was unable reasonably to accommodate the employee's religious needs without undue hardship, or, failing the employer's taking of active steps toward accommodation, the employer must prove that any proposed or possible accommodation would have created an undue hardship

on its business. See *Edwards v School Board of the City of Norton,* 483 F Supp 620, 625 (WD Va, 1980). In this case claimant has made a prima facie showing of religious discrimination by her employer against her religious needs and the need for accommodation. See *Brown v General Motors Corp,* 601 F2d 956, 959 (CA 8, 1979). In response, however, GM has stipulated to its failure to consider any alternative to Ms. Parks' religious needs other than dismissal, thus taking a position from the beginning that it had no duty to reasonably accommodate. GM has therefore clearly failed to prove that it has made good-faith efforts to accommodate claimant's religious beliefs. Likewise, GM has also failed to press on this Court any claim that it would have suffered an undue hardship on the conduct of its business were it to accommodate claimant's religious needs. See *Mitcham v Detroit,* 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, we would reverse the judgments of both the circuit court and the Court of Appeals.

### Conclusion

Our decision recognizes that an employer has both a duty to refrain from religious discrimination in employment and a duty to reasonably accommodate an employee's religious needs unless an undue hardship would be occasioned thereby. The opinions of our brothers Kavanagh and Levin find that there is no duty to reasonably accommodate. On that we are in disagreement. The opinion of our brother Levin, however, finds that there is nothing in this matter to "preclude a finding of discrimination based on evidence that an employer failed to act affirmatively to avoid the discriminatory effect of a facially neutral practice". With that we are in agreement.

Were we to base an order on our opinion as to the duty to accommodate alone, we would reverse the Court of Appeals and the circuit court and remand to the Michigan Civil Rights Commission for further proceedings not inconsistent therewith. However, inasmuch as the majority of this Court holds otherwise with respect to that part of our opinion, we base our order on that part of our opinion in which we are in agreement with our brother LEVIN where our opinion is a part of the majority, namely that the commission may, if the facts warrant, make "a finding of discrimination based on evidence that an employer failed to act affirmatively to avoid the discriminatory effect of a facially neutral practice". Therefore, we reverse the Court of Appeals and remand to the circuit court to take such further proceedings that are not inconsistent with the opinion that there may be a factual basis for "a finding of discrimination based on evidence that an employer failed to act affirmatively to avoid the discriminatory effect of a facially neutral practice". No costs, a public question.

FITZGERALD and BLAIR MOODY, JR., JJ., concurred with WILLIAMS, J.